**Vernon Lee EVANS, Jr., Petitioner,**

v.

**Willie SMITH, Warden,
et al., Respondents.**

**No. Civ. L–97–3711.**

United States District Court,
D. Maryland.

June 30, 1999.

Gerald I. Fisher, of Washington, D.C., and A. Stephen Hut, Jr., Jane L. McClellan, and Sandeep Parekh, of Washington, D.C., for petitioner.

J. Joseph Curran, Jr., Attorney General of Maryland, and Annabelle L. Lisic, Assistant Attorney General, for respondents.

## MEMORANDUM

LEGG, District Judge.

In 1984, a Maryland state jury convicted the petitioner in this case, Vernon Lee Evans, Jr. ("Evans"), on two counts of first degree murder for the shooting deaths of David Scott Piechowicz and Susan Kennedy. At the subsequent sentencing, the same jury imposed two death sentences.

On post-conviction review in 1991, the Circuit Court for Worcester County vacated the two death sentences and granted Evans a new sentencing. In 1992, a resentencing jury also returned two death sentences. In total, Evans has petitioned the Maryland Court of Appeals five times in this case, leading that Court to publish four separate substantive opinions, comprising approximately 164 pages.[1]

Now, fifteen years after his guilt phase trial, Evans has exhausted his direct and post-conviction appeals in the Maryland state courts and has filed this petition seeking a federal writ of habeas corpus relief pursuant to 28 U.S.C. § 2254. Because Evans filed his petition on November 3, 1997, it is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). AEDPA, Pub.L. 104–132, tit. I, §§ 101–06, 110 Stat. 1214–21 (Apr. 24, 1996).

Evans raises a number of alleged constitutional errors relating both to his guilt phase and resentencing trials. The parties comprehensively briefed the issues, and this Court held a hearing, at which able counsel represented Evans and the State of Maryland (the "State"). For the following reasons, the Court shall DENY Evans's petition for relief.

## I. Background

In 1985, the Maryland Court of Appeals summarized the underlying facts of this case:

> The United States also sought and obtained convictions of Evans and his co-defendant Anthony Grandison in federal court on federal charges of witness tampering and civil rights violations stemming from the same facts. For the series of opinions in that case, see *United States v. Grandison,* 780 F.2d 425 (4th Cir. 1985), *vacated by* 479 U.S. 1075, 107 S.Ct. 1269, 94 L.Ed.2d 130 (1987), *on remand,* 885 F.2d 143 (4th Cir.1989), *cert. denied,* 495 U.S. 934, 110 S.Ct. 2178, 109 L.Ed.2d 507 (1990).

---

1. *See Evans v. State (I),* 301 Md. 45, 481 A.2d 1135 (1984) (denying interlocutory appeal on double jeopardy); *Evans v. State (II),* 304 Md. 487, 499 A.2d 1261 (1985) (affirming convictions on direct appeal); *Evans v. State (III),* 305 Md. 306, 503 A.2d 1326 (1986), (denying motion for reconsideration); *Evans v. State (IV),* 333 Md. 660, 637 A.2d 117 (1994) (affirming resentencing convictions). In this opinion, the Court will cite for convenience to the Maryland Reports.

Evans and Anthony Grandison entered into an agreement whereby Evans would kill David Scott Piechowicz and his wife, Cheryl, because the couple were scheduled to testify against Grandison in a narcotics case pending in the United States District Court for the District of Maryland. Evans was to receive $9,000.00 from Grandison for performing the murders.

David Scott Piechowicz and Cheryl Piechowicz were employed at the Warren House Motel in Baltimore County. On April 28, 1983, Susan Kennedy, the sister of Cheryl Piechowicz, was working in the place of Cheryl at the Warren House Motel. The evidence was sufficient to prove beyond a reasonable doubt that, on April 28th, Evans went to the motel and, not knowing the Piechowiczs, shot David Scott Piechowicz and Susan Kennedy with a MAC–11 machine pistol. Nineteen bullets were fired at the victims, who died from the multiple gunshot wounds.

. . . . .

Among the witnesses offering significant incriminating evidence against the defendant Evans were Janet Moore, Charlene Sparrow and Calvin Harper. Moore, Grandison's girlfriend, had been contacted by Grandison, who was then in the Baltimore City Jail, to assist in making arrangements for the murder of the witnesses. Sparrow was Evans's girlfriend and offered the most damaging testimony about the defendant's involvement as the killer. According to Sparrow, she had accompanied the defendant and Moore to the Baltimore City Jail where the latter two visited Grandison two days before the shooting, inspected the reception desk area of the Warren House Hotel, and reported to the defendant concerning the people working

there and the presence or absence of security features. Sparrow testified that, at the request of the defendant and with his funds, she obtained a room at the motel, was with the defendant in the immediate area of the lobby at the time of the shooting, and wiped down the smoking MAC–11 machine pistol handed to her by the defendant immediately after the shooting. She related that the defendant told her that he would receive $9,000.00 "if he knocked both of them off." Harper's testimony involved activities of April 26, 27 and 28, 1983, and included a description of the defendant's acquisition of the machine pistol from Rodney Kelly, as well as the defendant's statement that he liked the gun.

*Evans II,* 304 Md. 487, 494–96, 499 A.2d 1261. The state and federal governments both brought charges against Evans in connection with the shootings. As part of a coordinated strategy between the United States Attorney's Office for the District of Maryland and the Baltimore County State's Attorney's Office, the agencies cross-designated special prosecutors for Evans's federal and state trials.[2] As a result, Assistant United States Attorney, David B. Irwin, participated in Evans's state trial.[3]

The guilt phase jury convicted Evans on two counts of first degree murder. At the sentencing phase, the jury returned two death sentences. Evans exhausted his direct appeals when the Supreme Court denied certiorari on June 30, 1986. 478 U.S. 1010 (1986). In 1991, however, the Honorable Theodore R. Eschenburg, Associate Judge of the Circuit Court for Worcester County, Maryland partially granted Evans's first petition for post-conviction relief and ordered resentencing, though he denied relief on the underlying convictions.

2. Following a change in venue, Evans's trial and first sentencing took place in Worcester County, Maryland rather than in Baltimore County, Maryland, where the shootings occurred.

3. Mr. Irwin is currently in private law practice in Baltimore.

(*See* Exh. 48 at 38.)[4] At resentencing in 1992, which was presided over by the Honorable Christian M. Kahl of the Circuit Court for Baltimore County, a jury again returned two death sentences. Again the Court of Appeals affirmed, *Evans IV*, 333 Md. 660, 637 A.2d 117 (1994); and again the Supreme Court denied certiorari, 513 U.S. 833, 115 S.Ct. 109, 130 L.Ed.2d 56 (1994).

Following completion of direct appeal on his resentencing, Evans filed a second post-conviction petition for relief in state court on August 29, 1995. This second petition primarily addressed matters relating to resentencing, but also addressed issues relating to the guilt phase trial and subsequent appeals. On January 24, 1997, after holding an evidentiary hearing, the Honorable James T. Smith, Jr. of the Circuit Court for Baltimore County, Maryland denied Evans's petition.[5] On May 7, 1997, the Court of Appeals denied leave for appeal. Evans filed a petition for certiorari to the Supreme Court. On November 3, 1997, while that petition was pending, Evans filed the instant habeas petition. The Supreme Court denied certiorari on November 10, 1997, 118 S.Ct. 411, leaving this habeas petition as Evans's last avenue for relief. Before addressing the merits of this petition, the Court will consider the appropriate standards for this Court's review of state court legal and factual determinations.

## II. Application of the AEDPA to this case

In 1996, before Evans filed this habeas petition, Congress enacted the Antiterrorism and Effective Death Penalty Act, ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1218. The statute amended Chapter 153 of Title 28 to narrow the scope of review of federal habeas petitions filed by state prisoners. *See id.* AEDPA also created a new Chapter 154, governing federal habeas corpus review for state death penalty cases.[6] *See id.*

Counsel for Evans and for the State agree that the case should be governed by the amended standards of review set out in 28 U.S.C. § 2254(d) and (e). Section (d) now provides that a federal court shall not grant relief with respect to any claim that was "adjudicated on the merits" in State court, unless that adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

**4.** Judge Eschenburg granted a resentencing because of deficiencies in the verdict sheet used at the first sentencing. *See Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). The Court of Appeals denied cross-petitions for leave to appeal from this ruling.

**5.** On April 24, 1996, while this second post-conviction petition was pending and before the Circuit Court had issued its opinion, the Antiterrorism and Effective Death Penalty Act ("AEDPA") became effective, significantly amending federal habeas corpus procedure. *See infra* section II.

**6.** Chapter 154 provides for an opt-in, "quid pro quo arrangement under which States are accorded stronger finality rules on federal habeas corpus review in return for strengthening the right to counsel for indigent capital defendants." H.R.Rep. No. 104–23, at 10 (1995); *see also Colvin–El v. Nuth*, Civ. No. AW 97–2520, 1998 WL 386403 at *8 (D.Md. July 6, 1998).

Other judges of this Court have decided that Maryland has not met the opt-in requirements for Chapter 154. *See Colvin–El*, Civ. No. AW 97–2520, 1998 WL 386403 at *8; *Booth v. Maryland*, 940 F.Supp. 849, 853–55 (D.Md. 1996), *rev'd on other grounds*, 112 F.3d 139, 145–146 (4th Cir.1997). It is not necessary for the undersigned to revisit this issue. The parties agree that because Evans's state post-conviction proceedings took place before the enactment of Chapter 154, the provisions of Chapter 154 would not apply to his case.

§ 2254(d).[7] New Section (e) also requires broad deference to state court factual determinations. Section (e)(1) now provides that a federal habeas court shall presume correct a state court's determination of a factual issue, with the petitioner having the burden of rebutting that presumption.

The Fourth Circuit recently issued its first opinion regarding the proper application of these standards. *See Green v. French*, 143 F.3d 865 (4th Cir.1998). In *Green*, the Fourth Circuit explained that courts should read § 2254 in a way that "accord[s] each term its most natural (even if not its only) meaning." *Id.* at 870. Based on such a reading, the Fourth Circuit held that "*habeas* relief is authorized only when the state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable...."[8] *Id.* The Fourth Circuit affirmed this standard of review in *Williams v. Taylor*, 163 F.3d 860, 865–866 (4th Cir. 1998), *petition for cert. granted,* — U.S. ——, 119 S.Ct. 1355, 143 L.Ed.2d 516, 1999 WL 148296 (U.S.1999).

As previously stated, the Maryland Court of Appeals has published four separate, substantive opinions in this case, encompassing approximately 164 pages. The

Evans "canon" also includes two unpublished opinions of the Maryland trial judges who decided Evans's post-conviction petitions. In these six opinions, the Maryland courts have addressed every issue that Evans raises in the instant habeas corpus petition. Accordingly, the standards of deference set out in amended § 2254, as interpreted by the Fourth Circuit in *Green*, will inform this Court's analysis.

In many of his claims, Evans contends that his previous counsel rendered ineffective assistance. These contentions are governed by *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prove that an attorney's performance warrants overturning a conviction and/or sentence, a defendant must satisfy a two-prong test. The defendant must demonstrate both that: i) "counsel's performance was deficient" and ii) "the deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. 2052. The *Strickland* test will govern this Court's analysis of each of Evans's ineffective assistance claims.

## III. Merits of Evans's petition[9]

Evans raises four distinct sets of claims. The first set, addressing both Evans's guilt

---

7. Under old § 2254(d), the Court would presume correct a state court's written factual findings, unless the petitioner could establish (or the state conceded) that the state court's procedure was inadequate in one of several ways. Old § 2254 did not, however, delineate the scope of federal review of a state court's determination of law.

8. The Fourth Circuit explained:
 a decision is "contrary to" precedent only when, either through a decision of pure law or the application of law to facts indistinguishable in any material way from those on the basis of which the precedent was decided, that decision reaches a legal conclusion or a result opposite to and irreconcilable with that reached in the precedent that addresses the identical issue. In contrast, a decision represents an "unreasonable application of" precedent only when that decision applies a precedent in a context different from the one in which the precedent was decided and one to which

extension of the legal principle of the precedent is not reasonable, when that decision fails to apply the principle of a precedent in a context where such failure is unreasonable, or when that decision recognizes the correct principle from the higher court's precedent, but unreasonably applies that principle to the facts before it (assuming the facts are insufficiently different from those that gave rise to the precedent as to constitute a new context for consideration of the principle's applicability).
 *Green*, 143 F.3d at 870.

9. The State of Maryland suggests that this Court is procedurally barred from reviewing part or all of Evans's claims on the merits. Maryland has a "finally litigated" rule, preventing a prisoner from raising, in his state habeas petition, a claim that was "finally litigated" on direct appeal by the state courts. *See* MD.ANN.CODE art. 27 § 645A(b) (1996 repl. vol.). The State seeks to extend the

phase and resentencing trials, essentially repeats allegations that Evans raised in his last petition for certiorari to the Supreme Court; the second set advances claims relating to the guilt phase trial; the third set advances claims relating to the resentencing trial; and the final set advances miscellaneous claims. The Court considers these sets in turn.

### A. Claims that Evans included in his last petition for certiorari, which the Supreme Court denied on November 10, 1997 (118 S.Ct. 411 (1997))[10]

#### 1. *Batson* claim from trial

Evans's first claim of error relates to the prosecutor's use of peremptory strikes at Evans's guilt phase trial in 1984. As this was a capital trial, the court (the Honorable Dale R. Cathell, Associate Judge of the Circuit Court for Worcester County, Maryland) conducted an extensive voir dire, both collectively (in open court) and individually (at the bench). After voir dire, during which a number of veniremen were stricken for cause, the petit jurors were selected.

The clerk directed the prospective petit jurors to stand, one at a time. As each rose, the judge asked counsel whether the juror was to be seated or stricken peremptorily.[11] Thus, in order for a juror to be seated, he had to be acceptable (not peremptorily stricken) to both sides.

Midway through the process, Judge Cathell called counsel to the bench, reminding them to stay in alternating order when exercising peremptories. A clear record was required, Judge Cathell advised, because of a line of Maryland cases disapproving racial strikes. Judge Cathell, who was marking the race of each venireman, particularly wanted to ensure that federal prosecutor Irwin was aware of the Maryland cases.

> Mr. Irwin is on loan from the United States Attorney's Office. There has been some extremely strong language in dicta about using peremptory challenges for racial purposes. And I think you ought to think about that. That's all I want to tell you and what Ms. Jung can tell you. But the Maryland law and Maryland cases, in the Attorney General's opinion in that respect, you are at least to consider, if you have not considered.

(Exh. 75 at 462). In response, Irwin stated that he was aware of the Maryland cases and denied that he was striking anyone based on race. (*See id.*).

After the twelve members of the petit jury had been selected, Evans's counsel asked to approach the bench. The following dialogue ensued:

> THE COURT: The Jury, as it is presently constituted, is it acceptable to the Defendant?
>
> DEFENSE ATTORNEY: Your Honor, may we approach the bench?
>
> THE COURT: You may. The record will reflect the Defendant is invited to the bench.

---

finally litigated rule to federal habeas corpus review of state prisoners' petitions. It argues that this Court is procedurally barred from addressing issues that were finally litigated on direct review.

This Court disagrees. To adopt the State's reasoning would eviscerate federal habeas review. If a state prisoner failed to raise a claim on direct appeal, he would be procedurally barred from raising it in his federal habeas petition. Yet, if the state prisoner did raise the claim on direct appeal, the finally litigated rule would prevent the federal court from considering the claim on habeas review.

**10.** Evans filed his last petition for certiorari following denial of his second state post-conviction petition.

**11.** The judge alternated between asking the prosecution and the defense to say first whether a juror was acceptable. In other words, for the first potential juror, the judge first asked government counsel whether he wished to exercise a peremptory strike; for the second potential juror, the judge first asked Evans's counsel whether he wished to exercise a peremptory strike, etc.

(Whereupon, Counsel and the Defendant approached the bench and the following proceedings were held out of the hearing of the jury.)

DEFENSE ATTORNEY: Your Honor, if Your Honor please, the panel is not acceptable to the Defendant as seated for the following reasons: One, that the State has exercised its peremptory challenges to purposely limit blacks from representation on the panel. The State struck eight of ten prospective black jurors utilizing their peremptory challenges.

. . . . .

DEFENSE ATTORNEY: I submit to the Court there were ten blacks presented to the jury panel and the State utilized its peremptory challenges to striking eight of those ten, leaving two blacks on the jury panel. I believe that the State did so in a manner to limit the black representation on the panel. I believe the State exercised its peremptory challenges in a totally racially motivated manner, and therefore, this panel certainly does not represent an adequate cross-section.

Based on that, Your Honor, the panel is not acceptable.

. . . . .[12]

THE COURT: Do you care to be heard on his objections raised to the panel by Defense Counsel?

PROSECUTING ATTORNEY: Yes, Your Honor. I don't know how many black people we struck. I didn't keep tract of whether we were striking black people or white people. We struck on background, age, occupation, what was learned during the voir dire at the bench and in open court. We did not strike on racial grounds.

I am looking now at the jury and I see that there are two black jury per-

sons on this jury. And I also note I am sure I struck some white people. I don't know. I am sure I struck some white people.

DEFENSE ATTORNEY: Two.

THE COURT: As to who is counting, it's two or three.

PROSECUTING ATTORNEY: That's news to me. I didn't keep track. I wasn't striking on racial grounds.

DEFENSE ATTORNEY: On that issue, may we make a proffer to the Court?

DEFENSE ATTORNEY: The peremptories exercised by the State—

THE COURT: The peremptories exercised by the State, according to my records, were ____, the lady in the red back here; ____–[13]

DEFENSE ATTORNEY: Yes.

THE COURT: -____-____. .

DEFENSE ATTORNEY: Excuse me, Your Honor. There was also ____.

THE COURT: I'm sorry, that's right. You are correct. There were eight. I did not have ____ down here.

DEFENSE ATTORNEY: That makes eight.

THE COURT: Eight blacks. We are in agreement. Very good. I'm sorry, I didn't have him down.

DEFENSE ATTORNEY: Now, the record is clear.

THE COURT: The objections are noted for the record. Your objections are overruled. And otherwise, the jury is now acceptable to you with the objections noted?

DEFENSE ATTORNEY: With those caveats, the panel is not acceptable. With the caveats, the panel is otherwise acceptable.

12. Judge Cathell, who had also been taking detailed notes, was under the impression that Irwin had stricken seven blacks.

13. The names of the veniremen have been redacted to maintain their privacy.

THE COURT: Thank you. Gentlemen, we will now proceed to seat two alternates.

(*Id.* at 474–79.).

In 1985, when *Evans II* was decided, *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), had not yet been superceded by *Batson.*[14] In *Evans II,* however, the Maryland Court of Appeals recognized that *Swain* was of doubtful validity.[15]

> The defendant argues, with considerable force, that *Swain* is no longer controlling. He points out that *Swain* was decided only on equal protection grounds, and that three years following the decision in that case the Supreme Court ruled in *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), that the Sixth Amendment guarantee of trial "by an impartial jury" was applicable to the states.

*Evans II,* 304 Md. at 525, 499 A.2d 1261. Anticipating *Batson,* the court then analyzed the considerable body of case law that had by then developed, holding that a prosecutor was constitutionally prohibited from exercising peremptory strikes based on race. *See id.* at 525–26, 499 A.2d 1261.

The Court of Appeals assumed arguendo that Evans had made a showing sufficient to establish a prima facie violation.[16] The court then reviewed the trial record to determine whether prosecutor Irwin had adequately rebutted Evans's prima facie case. In rejecting Evans's claim, the court found that: i) Judge Cathell had accepted Irwin's representations that the prosecution's strikes were not motivated by race and ii) the record was sufficient to support Judge Cathell's factual ruling:

> the explanation offered by the prosecutor, and apparently accepted by the [trial] court, was sufficient under the circumstances to support the decision of the trial judge in overruling the defendant's objection. The prosecution in this case had declined to exercise peremptory challenges against two blacks who were impaneled and instead used its two remaining challenges to exclude whites. It is also significant that neither the judge nor defense counsel questioned the explanation of the prosecutor or requested further particulars. This may well have represented a tactical decision by the defendant's counsel, to require the court's decision to be made upon the weighing of the defendant's prima facie showing against the rather general response of the prosecutor, as opposed to seeking specific information from the prosecutor as to each excused venireman and running the risk of further strengthening the prosecutor's explanation. For whatever reason, the explanation of the prosecutor stood uncontroverted and unimpeached. As we have indicated, it was sufficient to support the decision reached by the trial judge.

*Id.* at 528, 499 A.2d 1261.

■ The Supreme Court decided *Batson* while Evans's petition for certiorari, filed after his direct appeal, was pending.[17]

---

**14.** *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)

**15.** To sustain an equal protection claim for discrimination in the use of peremptories, *Swain* required a defendant to establish "the prosecutor's systematic use of peremptory challenges against [minorities] over a period of time." *Swain,* 380 U.S. at 227, 85 S.Ct. 824. Evans, however, did not make a *Swain* argument at trial or on direct appeal.

**16.** The Court of Appeals wrote that the following elements were necessary to establish a prima facie violation: i) the potential jurors who are excluded are members of a cognizable group and ii) there is a strong likelihood that they have been excluded merely because of their group membership. *See Evans II,* 304 Md. at 526–27, 499 A.2d 1261.

**17.** Under *Batson,* once a defendant makes out a prima facie case of purposeful discrimination, "the burden shifts to the State to ... demonstrate that 'permissible racially neutral selection criteria and procedures have produced the monochromatic result.'" *Batson,* 476 U.S. at 94, 106 S.Ct. 1712 (citation omitted).

Because Evans's conviction was not then "final," *Batson* controls. *See Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).

In his first state post-conviction petition, Evans sought a new trial on the ground that the earlier state court proceedings did not satisfy the newly-announced *Batson* standard.[18] Judge Eschenburg rejected Evans's claim, finding that:

i) "the [trial] Court and Petitioner's trial counsel [had] anticipated a *Batson* type case" and that "Judge Cathell, anticipating a *Batson* type decision, did, in fact, require the State to give its reasons for striking the black jurors." (Exh. 48 at 3, 6);

ii) Evans was incorrect in arguing that the trial court "should have demanded an explanation as to why *each* of these black jurors had been stricken" (Exh. 48 at 6 (emphasis in original));

iii) the reasons given by prosecutor Irwin were racially neutral;

iv) Judge Cathell had accepted those reasons;

v) the prosecutor's reasons, unlike those discussed in *Chew v. State,* 317 Md. 233, 562 A.2d 1270 (1989), did not appear to be disingenuous; and

vi) two black jurors (out of twelve) had been seated on the petit jury.

In his habeas corpus petition, Evans makes the following four claims under *Batson:*

i) because his trial and direct appeal concluded before the Supreme Court announced *Batson,* the federal courts should give no deference to the state proceedings described above;

ii) *Batson* requires, "[the] prosecution to articulate a race-neutral reason for *each* strike" once a prima facie case

has been established (Pet. at 10 (emphasis added));

iii) the race-neutral reasons given by prosecutor Irwin were clearly pretextual; and

iv) his appellate counsel rendered ineffective assistance by failing to demonstrate this pretext by comparing the ages, occupations, etc. of the potential jurors Irwin struck against those he did not strike.

None of these contentions, which the Court will address in turn, has merit.

First, anticipating the shifting burdens eventually adopted by the Supreme Court in *Batson,* the Maryland Court of Appeals in *Evans II* applied a reasonable and correct legal standard. In his post-conviction decision, Judge Eschenburg measured Evans's claim against *Batson,* which had by then been published. Accordingly, both state court adjudications are entitled to deference under § 2254(d) and (e).

Second, *Batson* does not require the prosecutor to provide an individual explanation for each strike. *See U.S. v. Davis,* 871 F.2d 71, 72 (8th Cir.1989) (finding sufficient the prosecutor's explanation that he exercised peremptory challenges based upon general characteristics, such as marital status, age, and employment); *U.S. v. Allison,* 908 F.2d 1531, 1537, 1538 n. 9 (11th Cir.1990) (finding satisfactory the prosecutor's explanation that he exercised peremptory challenges based upon general characteristics, such as education, family background, employment, and age). The prosecutor must only provide a " 'clear and reasonably specific' " justification for his use of strikes, "relat[ing] to the particular case to be tried." *Batson,* 476 U.S. at 98, 98 n. 20, 106 S.Ct. 1712 (citation omitted).

18. Under Maryland law, a post-conviction judge is not required to consider a claim that has been "finally litigated" on direct review. Judge Eschenburg found that Evans's *Batson* claim had been "finally litigated" in *Evans II.* (*See* Exh. 48 at 7). Nonetheless, he carefully

considered the merits of Evans's *Batson* claim, ultimately denying it. Following Evans's resentencing, the second post-conviction court refused to revisit his *Batson* claim, finding it "finally litigated" in the previous proceedings. (*See* Exh. 67 at 24.)

■ Third, Evans's analysis of the ages, occupations, etc. of the jurors stricken and accepted does not clearly demonstrate the pretextuality of Irwin's explanation.[19] The Supreme Court has stated: "[a]s with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'" *Hernandez v. New York*, 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (citing *Wainwright v. Witt*, 469 U.S. 412, 428, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)). Against Judge Cathell's contemporaneous evaluation of Irwin's credibility, Evans's retrospective parsing of the "curricula vitae" of the jurors is unavailing.[20]

Finally, Evans's appellate counsel were not constitutionally remiss in failing to develop this "curricula vitae" evidence on direct review. This Court finds the proposed evidence unpersuasive as it does not clearly demonstrate that the factual determinations of Judge Cathell and the Court of Appeals were incorrect. Accordingly, Evans's appellate counsel did not render ineffective assistance under *Strickland*.

Under § 2254(d), the aforementioned state adjudications are presumed correct, and may be overturned only if they: i) resulted in a decision contrary to *Batson*;

ii) unreasonably applied *Batson*; or iii) resulted in a decision based on an unreasonable determination of facts in light of the state court evidence. As none of these conditions exists, the state court adjudications pass muster under § 2254.

## 2. Ineffective assistance at resentencing, part 1: counsel's failure to call witnesses Weinstein and Pinkney

At Evans's guilt phase trial, the jury convicted him of first degree murder and related offenses. At the subsequent sentencing phase trial, the same jury imposed the death penalty. After this sentence was vacated on state habeas review, Evans was resentenced some eight years later, by a different jury. This second jury also imposed the death penalty.

■ Under Maryland law, a sentencing jury may not impose the death penalty unless it finds, beyond a reasonable doubt, that the defendant was a principal in the first degree.[21] As a practical matter in this case, the State was required to prove that Evans was the triggerman.

In the typical Maryland capital case, the prosecutor need not call witnesses during

19. Judge Cathell's refusal to reject the petit jurors was tantamount to an express finding that he accepted Irwin's reasons. In *Evans II*, the Court of Appeals reached the same conclusion, writing that Irwin's explanation was "apparently accepted by the [trial] court...." *Evans II*, 304 Md. at 528, 499 A.2d 1261. On post-conviction review, Judge Eschenburg found that Judge Cathell had required the State to give its reasons for striking the black jurors and had accepted those reasons. (*See* Exh. 48 at 6). *See Marshall v. Lonberger*, 459 U.S. 422, 433, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983) (holding that when a trial court's finding is evident from the record, the trial judge is not required to make an express statement of that finding). *See also Wainwright v. Witt*, 469 U.S. 412, 430–31, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

20. Evans's analysis of juror data, while industrious, is unpersuasive. It is limited and fails to take into consideration the many impressions that a potential juror makes on voir

dire. As the Supreme Court noted in *Batson*, " '[t]here are any number of bases' on which a prosecutor reasonably may believe that it is desirable to strike a juror who is not excusable for cause...." *Batson*, 476 U.S. at 98 n. 20, 106 S.Ct. 1712 (citation omitted).

Irwin did not confine his reasons for exercising strikes to curricula vitae information such as age and occupation, but he also mentioned "background" and "what was learned during the voir dire." The difficulties inherent in undertaking a quantitative analysis of a prosecutor's strikes makes the trial court's subjective credibility determination of paramount importance under *Batson*.

21. A principal in the first degree is a defendant who "actually commits a crime, either by his own hand, or by inanimate agency, or by an innocent human agent." *Gary v. State*, 341 Md. 513, 520, 671 A.2d 495 (1996) (quoting *Johnson v. State*, 303 Md. 487, 510, 495 A.2d 1, 12 (1985).

the sentencing phase to prove the principalship of the defendant. Instead, the government may rely on the jury's recall of the evidence presented in the just-concluded guilt phase trial. Because Evans's resentencing jury was new, however, the prosecution was obliged to call witnesses in support of its theory that Evans was the triggerman.

In preparing for the resentencing, Evans's new counsel, Assistant Public Defenders Sally C. Chester and William Kanwisher, were faced with a tactical decision. Should they pursue a mitigation strategy by demonstrating Evans's remorse, former drug use, and rehabilitation while in prison? Should they contest his principalship? Should they do both?

Experienced with capital cases, both Chester and Kanwisher recognized that actively contesting principality would undercut a mitigation defense. While the two defenses were not mutually exclusive, it was, in Chester's words, "difficult" and "not desirable" to advance both theories.[22] (Exh. 101 at 54–55).

As part of their preparation, resentencing counsel reviewed some sixteen boxes of documents comprising the record, discovery, and other materials in the state and federal trials of Evans and Grandison. (*See id.* at 50, 83). Counsel also met with Evans and interviewed witnesses.

As Chester explained, counsel ultimately decided that "we could not win on the principality issue" and came "to the conclusion and we had told Mr. Evans that this case, if we were going to get him a life sentence, was going to happen in mitigation."[23] (*Id.* at 133). Evans eventually, albeit reluctantly, "acceded" to the mitigation strategy. Chester explained: "I don't think he was very happy with it, but he acceded to what we did."[24] (*Id.* at 85, 88).

Chester did not concede principalship in her opening statement, though she did not deny it either. Rather, she emphasized mitigation. (*See id.* at 128–29, 133). During the government's case, Chester did not cross-examine the State's identification witnesses. (*See id.* at 55). The defense witnesses testified only as to mitigation.[25] In closing argument, Chester conceded that Evans had participated in the crimes as a first degree principal, but argued that life imprisonment, rather than death, was the appropriate punishment.[26] (*See id.* at 86).

**22.** This testimony is taken from the record of the evidentiary hearing on Evans's second post-conviction petition. During this hearing, Ms. Chester was asked: "Was there any inconsistencies as far as you were concerned in putting on evidence that he was not the shooter and at the same time putting on mitigation evidence?" She responded in part: "Well, it is difficult.... It is difficult but not impossible and not inconsistent.... It is not desirable, but you can do it." (Exh. 101 at 54–55).

**23.** Chester also testified: "Mr. Kanwisher and I came to the conclusion that mitigation was really the only way that we had to go of any substance." (Exh. 101 at 87).

**24.** Chester elaborated:

He [Evans] basically stood by his position that he did not do it [pull the trigger], that he was involved [but not as the triggerman]. There was never a verbal concession that he did it. How do I put it, Your Honor? We stopped fighting about it and there was an acceptance that the principality was going to be proven whether he liked it or not. He stopped denying he did it.... (Exh. 101 at 86).

**25.** In his allocution, Evans eloquently told the jury that he was remorseful for having been involved "in this hideous crime," and that "I am truly sorry for having been that type of individual that would take two innocent lives." (Exh. 95 at 10). Evans further stated that over the intervening nine years spent in prison, however, he had become drug-free, studied the evils of drugs and the drug lifestyle, rediscovered his Christian faith, learned useful skills, and helped others. (*See id.* at 10–12).

**26.** In her closing argument, Chester conceded that the jury should check the box on the verdict sheet, indicating that Evans had been a principal in the first degree:

And you know two people died, and you are going to check that off, and you know that they died because Anthony Grandison wanted them dead. He used Vernon Evans, and

In his second post-conviction petition, Evans claimed that his resentencing counsel, Chester and Kanwisher, provided ineffective assistance by failing to press a "not-a-principal" defense. In that regard, he faults his attorneys for failing to interview and call two witnesses, Roberta Weinstein and Darece Pinkney, whose testimony suggests that Evans was not the triggerman in the murders. Judge Smith held an evidentiary hearing at which Weinstein and Pinkney testified as did Chester and Kanwisher.

Briefly put, when the shootings occurred, Weinstein was working in her jewelry store inside the Warren House Hotel. She heard a sound like glass breaking; she saw a man firing a pistol, and she saw Scott Piechowicz fall. (*See id.* at 31–33). Weinstein was about 30–35 feet away. (*See id.* at 36). She could not see the gunman's face, and she could not discern his race. (*See id.* at 38). She recalls, however, that the gunman was a head shorter than Mr. Piechowicz and estimated the shooter's height at around 5'7" or 5'8". (*See id.* at 33). According to his petition, Evans is 5'2" tall. When Evans was asked to stand in the courtroom, Weinstein stated that the gunman was "a lot taller." [27] (*Id.* at 37–38).

Darece Pinkney testified that immediately after the time of the shooting, she was standing on her front porch, two doors down from the Warren House Hotel. She "saw a man just streak past my door." (*Id.* at 147). Pinkney described the man as a "black individual ... [a]bout five eight, five nine." (*Id.* at 148). When asked to look at Evans, who was standing at counsel table, she said that the person she saw was much taller. [28] (*See id.* at 154).

Both Weinstein and Pinkney gave statements prior to the guilt phase trial, and both were willing to testify at the resentencing had they been called. (*See id.* at 43, 155). Chester and Kanwisher testified that: i) despite doing some preliminary work to locate the witnesses, counsel had let them "fall through the cracks," ultimately never interviewing either witness before the resentencing; ii) they did not know what the witnesses' testimony would have been; iii) they would have called the witnesses on the principality issue had they been aware of the witnesses' potential testimony; and iv) their failure to call the witnesses was motivated by ignorance rather than tactics. (*See e.g. id.* at 52–54; Exh. 103 at 43–45).

At the second post-conviction hearing, Evans argued that Chester's and Kanwisher's failure to locate and interview the witnesses constituted ineffective assistance because: i) counsel's tactical decision to concede principalship is unsustainable as it was based on inadequate investigation; and ii) counsel's failure cannot be upheld as a trial strategy given that counsel disclaimed any strategic motivation in not presenting the witnesses.

Judge Smith rejected these arguments. In a series of factual determinations set out in his written opinion, Judge Smith concluded that Chester and Kanwisher "chose a trial strategy not to challenge the State's evidence on this [principalship] issue," "chose to present a position of remorse and rehabilitation," "pursued the strategy competently and consistently," and that "the decision to pursue mitigation was a sound tactical one reached after considering the issue and consulting with Petitioner and Petitioner voicing no objection." (Exh. 67 at 5).

---

he participated in this as the first degree principal, and for drugs, money, whatever, he did it, and you can check that off. (Exh. 95 at 75).

**27.** Weinstein also testified that the shooter was wearing "a light tan shirt or windbreaker" and "dark trousers", different clothes

from what Evans allegedly wore on the date of the shooting. (Exh. 101 at 34; *see also* Pet. at 16).

**28.** Like Weinstein, Pinkney testified that Evans was wearing "a light colored top and dark pants." (Exh. 101 at 148).

In a finding of law, Judge Smith, citing Maryland and Supreme Court precedent, stated that "[a] finding of ineffective assistance of counsel may never be predicated upon a strategy decision, unless the strategy was totally unreasonable."[29] (*Id.*). In a mixed finding of law and fact, Judge Smith held that the performance of Chester and Kanwisher, far from being constitutionally inadequate, was sound and effective. He concluded: "[p]etitioner has failed to demonstrate that resentencing counsels' strategic decision was unreasonable." (*Id.* at 5–6).

In his instant habeas corpus petition, Evans contends:

i) that Judge Smith applied an inaccurate legal standard when he wrote that a tactical decision must be upheld under *Strickland* unless it is "totally unreasonable." Because of this erroneous legal standard, Evans contends, Judge Smith's findings are entitled to no deference under § 2254(d) or (e); and

ii) counsel's failure to call Weinstein and Pinkney is a violation of *Strickland;* Judge Smith's opinion to the contrary being unreasonable under the law.

The Court will address these two arguments, neither of which has merit, in turn.

■ First, Judge Smith did not base his decision on a technical parsing of the phrase "totally unreasonable." Instead, he found that the strategic decisions of Chester and Kanwisher were "sound." A sound strategy is necessarily reasonable and adequate under *Strickland.* Accordingly, Judge Smith used the correct legal standard, and his opinion is entitled to deference under § 2254(d) and (e).

■ Second, the Supreme Court held in *Strickland* that strategic choices made after less than complete investigation are reasonable if the limitation on the investigation is supported by reasonable professional judgments.[30] *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052. Chester and Kanwisher abandoned their efforts to locate the two witnesses, whose testimony was potentially relevant solely to principalship, only after rejecting principalship in favor of mitigation. Their decision in this regard was entirely reasonable.

In fact, pursuing any course other than mitigation would have been of questionable judgment. At Evans's original trial in Worcester County, the State had demonstrated its ability to establish that Evans was the triggerman. The State had called witnesses who testified that Grandison hired Evans to kill Scott and Cheryl Piechowicz, that Evans admitted he would receive $9,000 if he "knocked both of them off," that Evans displayed a machine pistol the day before the shootings, that Evans rented a room at the hotel and was in the lobby at the time of the shootings, and that Evans was holding a smoking machine pistol immediately after the shootings. *See Evans II,* 304 Md. at 495–96, 499 A.2d 1261.

At the guilt phase trial, defense counsel cross-examined these witnesses, challenged their testimony, and argued that Evans was not the triggerman. Despite these efforts, the jury found Evans guilty

---

**29.** In support of this proposition, Judge Smith cited to: *Burger v. Kemp,* 483 U.S. 776, 794–95, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987); *Harris v. State,* 303 Md. 685, 496 A.2d 1074, (1985); and *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**30.** The Supreme Court explained:
strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.
*Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052.

beyond a reasonable doubt. The first sentencing jury imposed the death penalty, necessarily finding principalship beyond a reasonable doubt.

At resentencing, defense counsel could have reprised the early, unsuccessful not-a-principal defense or pursued a different strategy. They quite reasonably chose mitigation as the centerpiece of their case. While mitigation and principalship are not technically inconsistent, contrition sounds hollow if unaccompanied by an admission of wrongdoing.

Given their reasonable strategy decision to present a mitigation defense, resentencing counsel did not act unreasonably in failing to interview Weinstein and Pinkney. Accordingly, pursuant to § 2254, this Court defers to Judge Smith's finding that resentencing counsel pursued a sound trial strategy.

■ Even if Chester and Kanwisher had acted unreasonably in failing to interview the witnesses, Evans has not established that he was prejudiced.[31] Though no witness actually saw Evans shoot Piechowicz and Kennedy, the government amassed a tremendous amount of circumstantial evidence to that effect. Given the relatively weak testimony of Weinstein and Pinkney, this Court finds that the resentencing jury would have imposed a death sentence, whether or not defense counsel had called these two witnesses.[32]

### 3. Ineffective assistance at resentencing, part 2: date of parole

Evans contends that his resentencing attorneys were ineffective because they failed to call an expert on federal parole. Such an expert, Evans asserts, would have testified that Evans would not be paroled from his federal sentence, and begin serving his state sentences, for at least thirty years. The resentencing jury would have been less likely to sentence him to death had it heard this evidence; thus, the failure to call a parole expert was prejudicial. Evans raised this claim in his second postconviction petition; Judge Smith denied the claim on the merits.

At the time of his resentencing in 1992, Evans already faced four separate sentences for the killings. At the conclusion of his federal prosecution, Evans received a life sentence for conspiracy to violate civil rights and a consecutive ten year sentence for witness tampering. (*See Exh.* 4, Crim. Docket in *United States v. Anthony Grandison, et al.,* D.Md.Crim. No. HM–83–200, entry 242). When Judge Eschenburg vacated Evans's state death sentences, he left undisturbed a twenty year sentence on a handgun count and a life sentence for conspiracy to commit murder. (*See* Exh. 48 at 2, 28–31, 38).

The two state sentences were imposed consecutively to the federal sentence, meaning that Evans would not begin to serve his state sentences until he had been released from federal custody. The resentencing jury was obliged to determine

---

**31.** Had resentencing counsel been aware of the testimony of Weinstein and Pinkney, they could have done one of three things: i) ignore the testimony as irrelevant to mitigation; ii) change their strategy and mount a full attack on principalship; or iii) simply offer the testimony as an artifact, without much elaboration or other vigorous challenge to principalship.

Neither Chester nor Kanwisher stated that the testimony of Weinstein and Pinkney would have caused them to abandon mitigation and concentrate on principalship. Rather, they said they would have pursued the third option, offering the testimony as a side

argument. This Court finds the artifact option so unappealing as a tactic that the decision not to pursue it can hardly be deemed prejudicial.

**32.** Pinkney did not see the shooting; she merely described an individual who ran past her front porch. While Weinstein did observe the shooting, she did not have a good view as evidenced by her inability to discern the gunman's race or see his face. Moreover, Weinstein overestimated Scott Piechowicz's height by three to four inches, demonstrating her propensity to overestimate heights. (*See* Exh. 101 at 33; Exh. 105 at 66).

whether Evans would receive death or life sentences for the Kennedy and Piechowicz murders. If life sentences were imposed, the judge rather than the jury would decide whether the sentences would be imposed concurrently or consecutively to one another and to the other time Evans was serving. *See Hunt v. State,* 321 Md. 387, 405, 583 A.2d 218 (1990).

In a capital case, a defendant may "place before the jury relevant and competent information concerning his eligibility for parole in the event a life sentence is imposed...." *See Doering v. State,* 313 Md. 384, 412, 545 A.2d 1281 (1988). This rule was prompted by concerns that jurors will be disposed to impose capital punishment on the mistaken belief that prisoners sentenced to life will be paroled after a relatively short time.

There are limitations, however, on the types of information regarding parole that may be admitted. At the time of Evans's resentencing, under Maryland law, "predictions of a specific parole computation date would not be admissible." *See Hunt,* 321 Md. at 429, 583 A.2d 218 (citing to *Doering, supra* ). The rationale for this rule lies in the complexity of and discretion inherent in the procedures of the Maryland Parole Commission. Testimony regarding a specific date, which would involve opining as to the actions of an expert body some years in the future, was held to be overly speculative and, therefore, inadmissable.

Before resentencing, Evans's counsel called the Marion federal penitentiary, where Evans was then serving his federal sentence, and inquired as to Evans's parole status.[33] Mr. Kanwisher testified at the second post-conviction hearing that "the information that [he] got through that telephone conversation led [him] to believe that [Evans] would be paroled from the federal system, which it was explained to me meant that he would come to the state system sometime in '93." (Exh. 103 at 14–15).

Sally Chester, Evans's other resentencing counsel, testified that, to her recollection, "the information Mr. Kanwisher obtained was that he could or would be paroled in 1996 as I recall." (Exh. 101 at 56). Because of the nearness of the date of Evans's potential federal parole, counsel entirely avoided the issue of federal parole at resentencing. According to Ms. Chester, based on the information obtained by Mr. Kanwisher, they "avoided that issue like the plague." (*Id.* at 108).

Counsel instead focused their efforts on proving the likelihood that, if the jury imposed life sentences, Evans would probably die in prison or at least not be paroled until he had become an old man. In her opening statement, resentencing counsel stated that "two life sentences in this case will undoubtedly mean that this man will never walk outside the walls of a prison again." (Exh. 91 at 31).[34] As part of this strategy, resentencing counsel called Paul Davis, the Chairman of the Maryland Parole Commission, to testify on Evans's behalf. Due to the complexity of Maryland parole procedures and the restriction on specific parole dates from *Hunt v. State, supra,* Davis did not specifically estimate how long Evans would be incarcerated.[35] His testimony did, however, clearly inform the jury of his conclusions that: i) Evans

---

**33.** Mr. Kanwisher apparently spoke to Evans's counselor, a social worker who assists prisoners with their affairs. No name or other identifying information was produced at the second post-conviction hearing.

**34.** Further into her opening statement, counsel amplified her initial reference to Evans's already existing sentences:

Vernon Evans is serving a sentence right now that nobody is going to touch, that isn't going to go away of life plus ten years, another sentence of twenty years added on to that. So, we're up to life plus thirty, and another life sentence on that. In this case he can receive or will receive two more life sentences or the death penalty.

(Exh. 91 at 37).

**35.** At the conclusion of his testimony, Davis was asked to review the situation of a defendant in Evans's position:

would serve at least several decades in prison before becoming eligible for parole and ii) that a man in Evans's circumstances would be unlikely to be paroled even after he became eligible.

During closing argument, Evans's counsel emphasized to the jury that Evans was currently serving a federal sentence and would not begin his state sentence until after being released by the federal authorities:

Paul Davis told you how the parole system works, and the bottom line is this: Vernon Evans is 43 years old right now. Under the best case scenario, if he were to walk into the Maryland Penitentiary tomorrow on the sentence that he has already been sentenced on, he will do 17 years before he is "eligible" for parole. Seventeen and 43 makes 60, as I recall. He is 60.

He has not even started on what you do today, and at a minimum, you can assume he will do ten or twenty years on those before he is even eligible, so at 80, then in the 21st century, if he lives that long, which is highly unlikely under the circumstances of the prison world, he is "eligible," and even then, as you heard Mr. Davis say, lifers don't get paroled that easily. They simply don't.

(Exh. 95 at 98).

In response, the prosecutor briefly argued that Evans might be paroled before becoming an old man.[36] He spent most of his closing argument, however, contending that: i) the "murder for hire" killings justified death and ii) that Evans, whose prison record was spotty, was neither repentant nor rehabilitated. (*See id.* at 38–54, 112–15).

Evans's ineffectiveness argument makes several points: i) inadequacy of investigation, meaning that counsel merely called Evans's counselor at the Marion Penitentiary rather than doing research on their own; ii) had counsel done an adequate investigation they would have learned that Evans was highly unlikely to be paroled in 1993 or 1996 and would in all probability serve 30 years in federal custody; iii) counsel should have called experts to establish that Evans would be highly unlikely to be released on federal parole until serving thirty years; and iv) the resentencing jury would have been less likely to sentence him to death had it heard this testimony, meaning the failure was prejudicial.

Evans raised this ineffectiveness argument in his second post-conviction proceeding. At the hearing before Judge Smith, Evans called two attorneys who were experienced in federal parole, Messrs. Alan Chaset and A.J. Kramer.[37] These experts testified that, although Evans would have been eligible for a parole

Q: Just so we can go through this. If a person is serving life plus ten years in Maryland, non-death qualified, parole eligibility would be?
A: If the ten years is consecutive to the life sentence, parole eligibility would be fifteen years less diminution of sentence credits plus two and a half years, or one quarter of the ten year sentence.
Q: If there is an additional life sentence?
A: Then it would be fifteen less diminution of sentence credits, plus fifteen, less diminution of sentence credits plus two and a half.
Q: And an additional death qualified life sentence, the same?
A: Fifteen less diminution of sentence credits plus fifteen, less diminution of sentence credits plus two and a half, plus twenty-five less diminution of sentence credits.

(Exh. 94 at 118–19).

**36.** The prosecutor, after explaining that an inmate is eligible for parole after serving 15 years on a life sentence, stated "there is no proof, none at all, that he will die in jail, none at all." (Exh. 95 at 120).

**37.** Chaset had previously worked for Federal Judicial Center and had experience with the development of federal parole policy. The Court accepted, without objection, Evans's proffer of Chaset as an expert on "matters of Federal parole and Federal parole guidelines." (Exh. 102 at 18). There was a question, resolved in Evans's favor, however, as to whether, even when qualified as an expert, Chaset could testify as to a likely parole date in a non-speculative manner. (*See id.* at 25–27). Kramer's expertise was limited to prac-

review hearing in 1993 or 1996, the practice and procedures of the United States Parole Commission effectively meant that he would not have been paroled at any time in the near future, most likely not until serving over thirty years.

Judge Smith denied the claim on its merits, finding: i) that resentencing counsel produced adequate testimony and argument to support their contention that Evans was unlikely ever to be released from prison and ii) that there was not a substantial possibility that Evans would have avoided the death penalty had the resentencing jury heard the expert testimony. The second post-conviction court specifically found that:

> the jury had before it sufficient testimony and argument that Petitioner was unlikely to ever be released from prison, and this Court is not persuaded that there was a substantial possibility of a different outcome had Petitioner's counsel presented the evidence Petitioner contends should have been developed and presented.

(Exh. 67 at 13).

Having reviewed the record, the Court finds that Judge Smith's conclusions in both respects are entirely reasonable and entitled to be upheld on habeas review.[38] Accordingly, Evans's ineffective assistance claim relating to the likely date of his federal parole is denied.

## B. Claims regarding the guilt phase

The next group of Evans's claims relates to the guilt phase of Evans's trial. This Court will address each claim in turn, grouping, where appropriate, ineffective assistance of counsel claims with the corresponding claims of direct constitutional error.

### 1. *Swain* and peremptory challenges at guilt phase

Evans claims that, at his initial trial, the prosecutor unlawfully exercised the State's peremptory challenges to exclude blacks from the petit jury, in violation of *Swain, see supra* section III.A.1.[39] To a considerable degree, the holding in *Swain* has been superseded by the Supreme Court's decision in *Batson, see supra* section III.A.1. *Batson* significantly lowered the threshold showing a defendant must meet to make a prima facie case of discriminatory strikes. It left intact, however, the basic rule announced in *Swain* —prohibiting the use of peremptory strikes solely on the basis of race.

As discussed above in connection with the *Batson* claim, Evans's trial counsel objected to the petit jury on proto-*Batson* grounds. Finding that the prosecutor's peremptory strikes were not racially motivated, the trial court overruled the objection and seated the jury. Correctly applying a line of state and federal cases that anticipated *Batson*, the Maryland Court of Appeals, on direct review, affirmed. Neither at trial nor on direct review did Evans make a *Swain* objection.[40]

Evans for the first time sought to raise a claim under *Swain* in his second post-

---

tical experience as a federal public defender. (*See* Exh. 104 at 3, 14–22).

**38.** Evans's attorneys made a strategy decision, after learning that Evans was eligible for federal parole in a few years to "avoid the issue like the plague." By leaving the federal parole issue undeveloped, Chester could argue, as she did, that Evans would not even begin serving his state sentences until some indefinite future time when Evans had already served the federal sentence of life plus ten years. Had federal parole been developed factually, the jury would have learned of Evans upcoming eligibility date. It is mere speculation to guess whether the jury would

have paid more attention to the expert's prediction of 30 years or the fact of imminent eligibility.

**39.** In *Swain*, the Supreme Court held that a Fourteenth Amendment violation may occur "when the prosecutor in a county, in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of [all blacks from the venire panel]. . . ." 380 U.S. at 223, 85 S.Ct. 824.

**40.** The Court of Appeals stated that "no claim or evidence of a systematic exclusion of

conviction petition. At the hearing before Judge Smith, Evans presented the testimony of Dr. Richard Seltzer of Howard University. Dr. Seltzer testified to a statistical study, which he claimed demonstrated that the Baltimore County State's Attorney's Office, around the time of Evans's guilt phase trial, had struck blacks at a "disproportionate" rate. (*See* Exh. 102 at 99–120). Dr. Seltzer further testified that prosecutor Irwin's strikes had followed the same pattern. Judge Smith declined to consider the *Swain* claim. He ruled that Evans's challenge to the prosecution's peremptory challenges had already been "fully and finally litigated" on direct review.

This Court has already rejected Evans's *Batson* claim. His *Swain* claim must necessarily fail as well and for the same reason. The trial court made a factual finding that the prosecutor had not discriminated; the Court of Appeals affirmed, and the decisions of these courts are neither legally nor factually unreasonable.[41]

### 2. Under-representation in petit jury venire

Evans next claims that the Worcester County venire roll at the time of his guilt phase trial did not reflect a "fair cross section" of the population.[42] While blacks constituted 22% of the county's population, 19.85% of the veniremen at his trial were black.

Evans's claim involves several steps. First, he notes that the county used voter registration lists as the sole source for potential jurors. Second, he apparently alleges that blacks were under-represented on the county's voter registration list, meaning that blacks were correspondingly under-represented in petit jury venire panels. Third, he claims that the county's failure to correct this statistical disparity, through the use of motor vehicle records or other means, establishes a "prima facie case of intentional discrimination resulting in a denial of equal protection in violation of the Eighth and Fourteenth Amendments." (Pet. at 30).

Evans's claim must fail.[43] Evans challenged the racial composition, under the Sixth Amendment, of the venire panel in his first post-conviction appeal. Judge Eschenburg denied his claim on the merits; he stated that "the closeness of these two percentages by themselves, would indicate

blacks from criminal juries in Worcester County" existed. *Evans II,* 304 Md. at 525 n. 10, 499 A.2d 1261.

**41.** The testimony of Dr. Seltzer cannot overturn the presumption of correctness. First, his study centered on the Baltimore County prosecutor's office. Yet, the prosecutor who conducted voir dire in Evans's initial trial was from the United State's Attorney's Office, and Dr. Seltzer offered no evidence of a contemporaneous pattern of racially disproportionate strikes in federal trials. Second, under *Swain,* statistical evidence is used to make a prima facie case of discrimination, shifting the burden to the government to show a neutral ground for its strikes. The trial court must then make a factual determination as to whether the neutral grounds are pretextual or real. In *Evans II,* the Court of Appeals assumed that Evans had made a prima facie showing. As the Court of Appeals also found, the prosecutor stated his reasons; the trial court accepted the reasons, and the factual finding was supported by the record. These

findings, being reasonable, cannot be disturbed on habeas review.

**42.** The Sixth Amendment "entitles every defendant to object to a venire that is not designed to represent a fair cross section of the community, whether or not the systematically excluded groups are groups to which he himself belongs." *Holland v. Illinois,* 493 U.S. 474, 477, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990).

**43.** In the present petition, Evans seeks to plead this Sixth Amendment issue as an equal protection violation. For all practical purposes, the analysis remains the same. The Equal Protection Clause does not include a "fair cross section" requirement. To demonstrate a denial of equal protection, Evans would have to demonstrate substantial under-representation as a result of purposeful discrimination. As found by Judge Eschenburg, Evans has presented no evidence that would meet this more stringent standard.

that the 'equal protection' argument is without merit." (Exh. 48 at 8).

Also fatal to Evans's argument is specific Fourth Circuit precedent upholding the use of voter registration lists in Maryland courts and denying an identical claim made on Sixth Amendment grounds. *See United States v. Cecil,* 836 F.2d 1431, 1444–55 (4th Cir.1988) (en banc), *cert. denied,* 487 U.S. 1205, 108 S.Ct. 2846, 101 L.Ed.2d 883 (1988). In *Cecil,* the Fourth Circuit noted that "there is no violation of the jury cross-section requirement where there is merely underrepresentation of a cognizable class by reason of failure to register, when that right is fully open." *Id.* at 1448.

Evans has made no claim that blacks were preventing from registering to vote in Worcester County at the time of his trial. Accordingly, *Cecil* controls, and Evans's "fair cross section" claim fails.

### 3. Under-representation in grand jury

Evans next argues that the Baltimore County grand jury pool, from which his indicting grand jury was selected, systematically under-represented minorities and young adults. This under representation, he contends, violated the Sixth, Eighth, and Fourteenth Amendments.

Evans's claim is also governed by *Cecil,* 836 F.2d at 1444–45. Like Worcester County, Baltimore County selected the grand jury pool from voter registration lists rather than, for example, a combination of voter registration and driver's license lists. As was discussed in the preceding section, this method is constitutionally sound absent proof that the jurisdiction took affirmative measures to prevent the allegedly under-represented group from registering. Because Ev-

ans has presented no such evidence, his claim must fail.

Evans also alleges that "at the time of Evans' trial there did not appear to be any procedure or regularly applied and objective guidelines for selecting the grand jury foreperson." (Pet. at 31). This lack of procedure, the petition alleges, resulted in a lack of black and young adult grand jury forepersons. Evans raised a substantially similar claim in his first post-conviction petition; that court denied the claim on the merits. Judge Eschenburg found that "virtually no evidence was offered to substantiate [this claim]." (Exh. 48 at 10).

In his habeas corpus petition, Evans raises this argument in three bare paragraphs. (*See* Pet. at 31–32). He offers no new analysis or evidence. Accordingly, Judge Eschenburg's factual finding that Evans's proof on this issue was lacking must be affirmed by this Court. *See* § 2254(e).

### 4. No individual voir dire

■ Although Evans's petition is unclear on this point, he apparently argues that, at his initial trial, each venireman should have been questioned separately, giving his/her answers out of the presence of the other potential jurors.[44] Judge Cathell denied his request that all veniremen be questioned separately.

Evans raised this claim on direct review. In considering the claim, the Court of Appeals described the combination of group (in open court) and individual (at the bench) voir dire employed by Judge Cathell:

> Judge Cathell combined techniques of collective and individual voir dire in this case. When general questions could be asked of the venire without danger of

---

44. In his petition, Evans makes the conclusory statement that there was no individual voir dire at trial. This statement is erroneous. In *Evans II,* the Maryland Court of Appeals found that Judge Cathell questioned some potential jurors at the bench. On post-conviction review, Judge Eschenburg reached the

same conclusion. This Court also found in the record many instances in which Judge Cathell conducted voir dire at the bench, specifically on sensitive issues. (*See e.g.* Exh. 75 at 257–60 (where a potential juror was excused for cause because he had been influenced by pretrial publicity)).

prejudice, that procedure was followed. When it appeared that a particular question might produce an answer that should not be heard by other jurors, the answer was received at the bench.

*Evans II*, 304 Md. at 515, 499 A.2d 1261.

On direct review, Evans did not raise specific defects in Judge Cathell's voir dire; he did not point to questions that Judge Cathell refused to ask; he did not identify veniremen whose questioning was inadequate. Instead, Evans argued generally that individual voir dire would have been more thorough and assisted him in making better use of his peremptory challenges.

The Court of Appeals rejected Evans's claim, explaining that the manner of conducting voir dire lies within the sound discretion of the trial judge. Because Evans offered no evidence that Judge Cathell abused his discretion, the appeals court affirmed. *See Evans II*, 304 Md. at 514–515, 499 A.2d 1261.

Evans also raised his voir dire claim in his first post-conviction petition. Judge Eschenburg found the claim unpersuasive, concluding that "the matter of individual voir dire is discretionary with the Court." (Exh. 48 at 12).

The decisions of the state courts are reasonable. Evans cites no authority for the proposition that individual voir dire is constitutionally mandated in death penalty cases.[45] Judge Cathell's voir dire followed the practice regularly used in criminal cases in this federal District. Veniremen answer general questions in open court. Sensitive or follow-up questions, however, are usually asked and answered at the bench.[46] This process works well and promotes efficiency without sacrificing fairness. Accordingly, the state court adjudications must be upheld.

### 5. Adverse publicity

 Because of extensive pretrial publicity, Evans's trial was once removed from Baltimore County to Worcester County.[47] Evans nonetheless claims that extensive publicity in Worcester County poisoned his trial. Evans now contends that the trial court's denials of a second removal motion, a motion for continuance, and a request for individual voir dire of prospective jurors and jury sequestration violated his Fifth, Sixth, and Fourteenth Amendment rights.

Judge Cathell conducted individual voir dire of prospective jurors who had been exposed to pretrial publicity. For example, after determining that a venireman had read newspaper accounts of the shootings, Judge Cathell questioned the venireman at the bench, ultimately striking him for cause:

> THE COURT: Would you be able to disregard what you have read in the newspaper and base your decision in this case upon the evidence and testimony that you hear in this courtroom and base it on nothing else but what you hear during this trial?

---

**45.** In fact, the only support Evans offers for this claim is Supreme Court dicta stating that *Batson* does not require the elimination of peremptory challenges. *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 143, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) ("voir dire [in general] can inform litigants about potential jurors, making reliance upon stereotypical and pejorative notions about a particular gender or race both unnecessary and unwise.") Hence, he argues that individual voir dire was necessary in order for him to make proper use of his peremptories.

**46.** For example, Judge Cathell asked questions at the bench of the veniremen who had been exposed to pretrial publicity. Judge Cathell's voir dire was extensive and thorough. Moreover, at times he instructed the veniremen that they were free to answer questions at the bench if they felt uncomfortable doing so in open court. (*See e.g.* Exh. 75 at 406).

**47.** Baltimore County, which partially surrounds Baltimore City, is urban and suburban in character. Worcester County, lying on Maryland's Eastern Shore (meaning east of the Chesapeake Bay), is geographically remote from Baltimore County and rural in character.

JUROR: I guess I would.

THE COURT: Do you have any opinions as to whether or not in this case Vernon Evans is guilty or not guilty of the matters he is charged with?

JUROR: You mean what do I think?

THE COURT: Do you have any preconceived opinions as to whether or not he is guilty or innocent?

JUROR: Yes.

THE COURT: What is that opinion?

JUROR: Guilty.

THE COURT: Why do you have an opinion he is guilty?

JUROR: I don't know. Just what I have read and heard.

(Exh. 75 at 259).

Based on this exchange and others like it, Judge Cathell was able to assess the extent of the pretrial publicity and its impact on the venire panel. Judge Cathell minimized this impact by striking twenty potential jurors for cause due to media exposure and by entering an order curtailing the public statements of everyone involved with the trial. Evans argues that despite such voir dire and other measures, the trial court failed to take reasonable precautions to safeguard him from prejudicial pretrial publicity.

The Court of Appeals considered this claim on direct appeal and denied it, holding that Judge Cathell did not abuse his discretion by denying Evans's requests for a second removal, a continuance, individual voir dire, and jury sequestration. *See Evans II*, 304 Md. at 509–16, 499 A.2d 1261. In reviewing the record, the Court of Appeals found:

> the trial judge possessed a complete understanding of the surrounding circumstances and of the applicable law. His conclusion that "the publicity that [had] been brought to the Court's attention

would [not] deny us the opportunity to pick a fair and impartial [jury]" was amply supported by the record, and was confirmed by the subsequent voir dire of prospective jurors.

*Id.* at 512, 499 A.2d 1261. Likewise, upon review of the record, the first post-conviction court found no abuse of discretion and ruled that Evans's claim was meritless. (*See* Exh. 48 at 11–12.)

■ The state courts' determinations were factually sound and reasonable. The Supreme Court has held that "[e]xtensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair." *Dobbert v. Florida*, 432 U.S. 282, 303, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). The manner of mitigating prejudicial pretrial publicity lies within the sound discretion of the trial judge because that judge is in the best position to evaluate the impact of such publicity. *See e.g. Ehrlichman v. Sirica*, 419 U.S. 1310, 95 S.Ct. 6, 42 L.Ed.2d 25 (1974); *US v. Bakker*, 925 F.2d 728 (4th Cir.1991). Evans has submitted no evidence that warrants disturbing the state courts' findings that Judge Cathell adequately addressed the publicity surrounding Evans's trial. The state courts' rejections of Evans's claims are legally and factually reasonable and cannot be disturbed.

### 6. Witness's pretrial identification of Evans tainted his in-court identification

■ During Evans's trial, Calvin Harper identified Evans, who was seated at counsel table, as the man who received the murder weapon from Harper's friend, Rodney Kelly. Before trial, during grand jury proceedings, Harper was shown a single photograph of Evans. Evans contends that this pretrial identification tainted the trial identification.[48]

---

**48.** Evans argues that the trial court's denial of his motion to suppress the in-court identification violated his due process and Sixth Amendment rights. The State contends that

Evans is procedurally barred from arguing this Sixth Amendment violation because he failed to raise such a violation in his state court proceedings. Evans maintains that this

The Supreme Court has developed a two-part test for determining whether due process requires the suppression of an in-court identification. First, the pretrial identification procedure must have been impermissibly suggestive. Second, under the totality of the circumstances, the pretrial identification must have been unreliable.[49] *See Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

In considering Evans's claim on direct appeal, the Maryland Court of Appeals explicitly applied the *Manson* test. Although the court concluded that the showing of a single photograph of Evans was impermissibly suggestive, it determined that the pretrial identification was nevertheless sufficiently trustworthy to make its reliability a question of fact for the jury:

> In the case at bar, Harper was in the immediate presence of the person known to him as "Shorty" for four daylight hours, and viewed him face to face on more than one occasion. His opportunity to view this person was therefore excellent and protracted. It is a fair inference that the degree of attention paid by Harper to "Shorty" was more than casual. They were specifically introduced to one another; they were together for a substantial period of time in a group of only three persons; and the fact that "Shorty" inspected and expressed approval of a machine gun that had been shown to him by Harper's friend could reasonably be expected to focus Harper's attention on this new acquaintance. Harper's description of "Shorty" given to the investigators prior to the photographic identification was unremarkable but accurate. His description was of a short, black male, between 5′4″ and 5′5″ in height. The

record does not reflect any hesitation on the part of Harper in identifying the defendant's photograph.

*Evans II*, 304 Md. at 499, 499 A.2d 1261.

The Court of Appeals's analysis is entirely reasonable. Accordingly, this Court will defer to the state court's findings of law and fact.

**7. Witness not subjected to psychiatric examination**

■ Evans next asserts that the trial court violated his Sixth and Fourteenth Amendment rights by refusing to order a psychiatric evaluation of chief prosecution witness, Charlene Sparrow. Evans's former girlfriend, Sparrow provided the most damaging evidence against him at trial. Evans claims that Sparrow's statements during her many interviews with the police and FBI were so inconsistent as to denote lying. Evans contends that such lies, compounded by the fact that Sparrow was a prostitute and a drug addict in withdrawal at the time of these interviews, gave cause for substantial doubt as to her capacity for telling the truth.

In a pretrial motion, Evans requested an examination of Sparrow by a forensic psychiatrist, Dr. Neil Blumberg, who would give expert testimony as to whether Sparrow was capable of distinguishing truth from falsehood.

Although Judge Cathell denied the motion, he did not allow Sparrow to testify at trial until he had first questioned her out of the jury's presence and satisfied himself as to: i) her competence as a witness and ii) her capacity to distinguish truth from falsehood. Evans contends that the trial court's denial of the pretrial motion de-

---

failure was due to the ineffective assistance of his counsel and, therefore, any procedural bar is obviated. Whether or not the Sixth Amendment argument is barred, the Court finds it without merit.

**49.** In determining whether the identification was reliable, a court should consider "the opportunity of the witness to view the crimi-

nal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

prived him of a fair trial and an opportunity to cross-examine Sparrow effectively.

The Court of Appeals denied this claim on direct appeal, finding that Judge Cathell had "understood the applicable law and carefully balanced the need for a psychiatric examination against the relevant factors present in this case." *Evans II,* 304 Md. at 509, 499 A.2d 1261. The Court of Appeals agreed with Judge Cathell that cross-examination was a proper safeguard of Sparrow's credibility. There was, in the appellate court's view, insufficient evidence of Sparrow's alleged mental incompetence for the trial court to have required a psychiatric examination. *See id.* at 504–09, 499 A.2d 1261. Both post-conviction courts also denied the claim on its merits.[50] (*See* Exhs. 48 at 16; 67 at 25). The state court adjudications are reasonable and must be upheld.

The authority on which Evans relies in his habeas petition does not support his claim that the denial of a psychiatric examination violated his constitutional rights. Rather, the cases provide for impeachment regarding a witness's mental illness when there is previous documentation of the illness. *See United States v. Lindstrom,* 698 F.2d 1154, 1159–68 (11th Cir.1983) (finding that district court erred in refusing to allow cross-examination on witness's involuntary institutionalization and extensive prior treatment for mental illness); *United States v. Society of Indep. Gasoline Marketers,* 624 F.2d 461, 467–69 (4th Cir.1979) (finding that district court should have admitted prior medical records indicating mental illness); *United States v. Partin,* 493 F.2d 750, 763–64 (5th Cir.1974) (same). These cases do not stand for the proposition that a defendant is automatically entitled to subject a witness to a psychiatric evaluation to see whether a mental illness exists.

The trial court's refusal to compel a mental examination of Sparrow did not unconstitutionally hinder Evans's ability to cross-examine her. The Court finds the state courts' conclusions in this regard to be eminently reasonable.

## C. Claims regarding Evans's resentencing

The next set of issues addresses Evans's resentencing. For convenience, this Court has reorganized these claims somewhat; and as before, will group some of Evans's claims of ineffective assistance of counsel with the underlying substantive claims.

### 1. Jury not a fair cross-section of community

Evans raises the same contention here with regard to the Baltimore County resentencing petit jury panel as he raised with regard to his grand jury panel, i.e. that the selection process produced a venire panel on which blacks were under-represented. Evans notes that the resentencing venire of 125 people included twelve African–Americans; in comparison, approximately thirteen percent of the population of Baltimore County is African–American. (*See* Pet. at 40). The second post-conviction court found that Evans had waived this claim, because Evans's resentencing counsel did not raise this challenge at the resentencing, nor did Evans's appellate counsel raise the claim during direct appeal from the resentencing. (*See* Exh. 67 at 19).

▮ This waiver represents a true procedural default, barring this Court's consideration of the claim absent a showing of both "cause" and "prejudice." *See* 28 U.S.C. § 2254(b)(1); *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Evans claims to have met both prongs of this standard. The Court disagrees. While Evans claims that counsel's failure to raise the claim constituted ineffectiveness sufficient to satisfy the "cause"

---

50. The second post-conviction court stated that it knew of no authority that would have allowed Judge Cathell to order a witness to undergo a psychiatric examination "for information purposes." (Exh. 67 at 25).

requirement, that naked allegation is insufficient: "the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause [to excuse] a procedural default." *Murray*, 477 U.S. at 486–88, 106 S.Ct. 2639. *Murray* recognizes the need for some "objective impediments to compliance" to constitute "cause." *Id.* at 488, 106 S.Ct. 2639.

▇▇ In this case, Evans himself points out that his resentencing counsel recognized the claim, but failed to raise it. (*See* Pet. at 41). The strategic decision not to raise a particular challenge does not constitute "cause" sufficient to overcome the procedural default.

In any event, this Court would find no "prejudice."[51] As discussed in section III. B.2, absent proof that blacks or other distinct groups were discouraged from registering, a jurisdiction may select its venire panels from voter registration lists. *See United States v. Cecil*, 836 F.2d 1431, 1444–55 (4th Cir.1988) (en banc), *cert. denied*, 487 U.S. 1205, 108 S.Ct. 2846, 101 L.Ed.2d 883 (1988).

## 2. Voir dire insufficient/ improper denial of strikes for cause regarding feelings on death penalty

Evans's next alleged error involves the resentencing court's questioning of the voir dire panel on the issue of capital punishment. Evans claims that the resentencing court: i) improperly failed to ask venire members whether their knowledge of Evans's convictions would cause them to vote automatically for the death sentence and ii) refused to strike for cause veniremen who, from the individual voir dire conducted in Judge Kahl's chambers, appeared to favor the death penalty. The Court of Appeals denied the underlying voir dire claim on direct appeal from the resentencing. *See Evans IV*, 333 Md. at 667–77, 637 A.2d 117. The second postconviction court denied Evans's claims of ineffective assistance with regard to the voir dire claim. (*See* Exh. 67 at 9–10, 16–17).

▇▇ Under Supreme Court precedent, a juror who would in no case vote for capital punishment, or who would automatically vote for the death penalty in every case, should be removed for cause. The rationale behind this rule is that such a juror would fail to consider the evidence of aggravating and mitigating circumstances, rendering the juror not impartial. *See Morgan v. Illinois*, 504 U.S. 719, 728–29, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). To ensure that the trial will court remove such jurors, it must conduct "voir dire sufficient to permit identification of unqualified jurors...." *Mackall v. Angelone*, 131 F.3d 442, 451 (4th Cir.1997) (citing *Morgan*, 504 U.S. at 729–30, 112 S.Ct. 2222). Despite this, the Constitution "does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury," and the form of voir dire is in large measure left to the discretion of the trial court. *Morgan*, 504 U.S. at 729, 112 S.Ct. 2222.

▇▇ In this case, the resentencing court provided each prospective juror with a questionnaire asking several questions exploring the *Morgan* issue. (*See* Exhs. 59, 60.) The record shows that the resentencing court reviewed this questionnaire, and in some cases expanded upon it during individual voir dire, with each of the venire members who served on the jury.[52] (*See*

---

51. In the second state post-conviction proceeding, Evans coupled the underlying substantive claim with a claim that his counsel had been ineffective in not raising the issue. (*See* Exh. 67 at 6–9, 15–16). Because this Court finds the substantive claim without merit, it likewise, because of lack of prejudice, disposes of the claim of ineffective assistance of counsel.

52. The jurors who actually serve on the panel are the appropriate focus of inquiry into the adequacy of voir dire. *See Ross v. Oklahoma*, 487 U.S. 81, 86, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988).

Exh. 85 at 82–84; Exh. 86 at 5–6; Exh. 87 at 33–35, 38–40, 41–43, 52–53, 84–86, 93–95,[53] 108–10; Exh. 88 at 45–47, 74–76,.78–80.)

The Court of Appeals devoted ten pages of its opinion to a detailed examination of the governing law and the application thereof to Evans's trial. In conclusion, the Court of Appeals found that "the questions posed to the venirepersons were sufficient to uncover any pro-death penalty bias and measure that bias against the standard for juror exclusion." *Evans IV*, 333 Md. at 677, 637 A.2d 117. Having examined the voir dire transcript, this Court concludes that the Court of Appeals understood and reasonably applied *Morgan* when reviewing this claim on direct appeal. The voir dire conducted by the resentencing court was thorough and painstaking. Accordingly, the Court of Appeals's rejection of Evans's claim cannot be disturbed.[54]

### 3. Appellate counsel ineffective on strikes for cause

In a claim related to the immediately preceding one, Evans contends that appellate counsel provided ineffective assistance by not contesting the resentencing judge's decisions to strike prospective jurors who expressed reservations about the death penalty. Evans claims that, when examining venire members whose initial responses indicated general scruples against capital punishment, the resentencing judge too

easily granted motions to strike and inadequately used follow-up questions to rehabilitate.

This failure to rehabilitate, Evans claims, violated his due process right to an impartial jury under *Morgan*, constituting "prejudice" under *Strickland*. The second post-conviction court denied this claim on the merits, relying in part on the Court of Appeals's decision affirming the resentencing and upholding the adequacy of the voir dire. (*See* Exh. 67 at 16–17 (citing *Evans IV*, 333 Md. 660, 637 A.2d 117)).[55]

As discussed above, the process of voir dire is left largely to the discretion of the trial court; the process is subject to a presumption of correctness on habeas review. *See Wainwright v. Witt*, 469 U.S. 412, 426–29, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). This limited collateral review is restricted still further by the revisions of the habeas statute under the AEDPA. *See supra* section II. This Court, having reviewed the record, finds no error in the legal or factual decisions of the state courts in this matter, and declines to disturb their reasonable determinations.

### 4. Insufficient voir dire regarding racial prejudice

■ Evans claims that the resentencing court failed to provide meaningful voir dire concerning the racial attitudes of prospective jurors, thereby violating his rights

---

53. For example, one juror, who gave an answer indicating that he would be willing to sentence a murderer to death, was next asked, "if you learned of mitigating circumstances that would, perhaps, indicate something other than the death penalty, would you be able to keep an open mind about such things?" The juror answered in the affirmative. (*See* Exh. 87 at 94). When then asked if he felt his attitude regarding the death penalty would prevent or substantially impair him from making a fair and impartial decision, in keeping with the juror's oath, the Court's instructions, and the evidence, the juror said it would not. (*See id.*). He further affirmed that he would be capable of voting for death, or a life sentence, after listening to the evidence and applying the law. (*See id.* at 94–95). On this record, and the record of the

voir dire of the other serving jurors, this Court does not find a *Morgan* violation.

54. Because this Court finds this substantive claim without merit, it likewise, because of lack of prejudice, disposes of the claim of ineffective assistance of counsel premised upon these same grounds. (*See also* Exh. 67 at 16–17 (dispensing with this claim on second post-conviction petition)).

55. As described in connection with the previous claim, the Court of Appeals undertook an exhaustive examination of the voir dire at Evans's resentencing and approved Judge Kahl's handling of the process. *See Evans IV*, 333 Md. at 667–77, 637 A.2d 117.

under the Due Process Clause. Specifically, he claims that the court erred in failing to identify specifically the victims as white and Evans as black. Like the previous claims regarding the adequacy of voir dire, the trial court has broad discretion in this area. *See Mu'Min v. Virginia*, 500 U.S. 415, 424, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991) (while a black defendant is entitled to inquiry on voir dire into racial prejudice when charged with a violent crime against a white person, the "trial court retains great latitude in deciding what questions should be asked on *voir dire* ").

The resentencing court did ask each individual venire member who ultimately served on the jury panel whether the fact that Evans was black, or that the defendant and victims were of "different ethnic or racial backgrounds," would impact upon the prospective juror's decision. (*See* Pet. at 49). In his second post-conviction petition, Evans contended that the trial judge should have explicitly stated that the victims were white. Judge Smith denied his claim on the merits. Judge Smith examined the procedure used during voir dire and found that "the resentencing court adequately addressed race during voir dire." (Exh. 67 at 10). This Court agrees with Judge Smith and finds that Evans's alleged error amounts to a quibble over semantics rather than a constitutional error that would justify relief under the § 2254 standard.[56]

### 5. Bifurcation and ineffective appellate counsel

■ Evans next alleges error in the way his resentencing was conducted. According to Evans, the resentencing should have occurred in two phases. First, the jury should have determined whether he was a principal in the first degree under Maryland law. Only if a positive finding was made on that issue, should the comparison of aggravating and mitigating factors have been undertaken. In conjunction with the bifurcation issue, Evans claims that his resentencing appellate counsel were ineffective in failing to raise the issue.

Bifurcation was first raised in the second post-conviction proceeding. Judge Smith denied the claim on the merits, noting that a Maryland trial court does not have the power to bifurcate a death penalty sentencing. (*See* Exh. 67 at 18, 21 (citing *Booth v. State*, 327 Md. 142, 159–61, 608 A.2d 162)).

At sentencing, the State, by statute, is required to prove that the defendant was a principal in the crime in order for the defendant to be eligible for the death penalty. The Court of Appeals decided in *Booth, supra*, that a trial judge has no authority to bifurcate the statutorily-defined sentencing procedure. As for federal law, although there is a strong preference for bifurcation of the guilt/innocence trial from the sentencing hearing in death penalty cases, *Gregg v. Georgia*, 428 U.S. 153, 190–91, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), there is no constitutional necessity to do so, *McGautha v. California*, 402 U.S. 183, 213–20, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), *vacated on other grounds*, 408 U.S. 941, 92 S.Ct. 2873, 33 L.Ed.2d 765 (1972). If the Constitution permits the issues of guilt and sentence to be decided in one trial, it does not require a sentencing trial to be subdivided.

Additionally, Evans's counsel, as part of a strategy of mitigation, specifically conceded that Evans participated in the murders as a principal in the first degree. *See supra* section III.A.2. Accordingly, there would have been nothing for the jury to have considered in a separate proceeding. The Court finds the state court's determination on the bifurcation issue to be rea-

---

**56.** Because this Court finds the underlying claim on this count to be without merit, it likewise, because of lack of prejudice, disposes of the claim of ineffective assistance prem-

ised upon it. (*See also* Exh. 67 at 17–18, 20 (dispensing with same argument on second post-conviction review)).

sonable and that Evans is not entitled to relief.

### 6. Judge's response to jury's question on potential sentences/ineffective assistance

■ Evans's next alleged error relates to a question posed by the jurors during his resentencing. During its deliberations, the jury handed out an ambiguous note regarding: i) the consecutive nature of Evans's life sentence or sentences and ii) the total time that Evans would serve. The note stated:

> Was the life sentence consecutively or were they not? What happens if they (the sentence) is not consecutively? How many years approximately will serve not including credits that would be deducted? [sic]

(Exh. 95 at 130).

Upon receiving the note, Judge Kahl recalled counsel and the defendant into court and read the note aloud, "with the grammar intact, such as it is." (*Id.*). Judge Kahl then interpreted the first question as referring to the sentences already imposed. He suggested that the jurors should be told that their recollection of the evidence controlled as to both that question and the second question on how long Evans would serve.

Judge Kahl gave both the defense and the prosecution an opportunity to comment. Both sides agreed that the jurors should be directed to the pre-sentence report for information on the prior sentences and that no appropriate summarizing instruction could be given on the parole issue. After discussing the note with counsel, the court, sent the jury the following written response:

> The sentences already imposed are reflected in the pre-sentence investigation report. Otherwise, you must rely upon the testimony and your recollection of the evidence before you.

(*Id.* at 133–34). The jury returned two death sentences approximately one-half hour after receiving the judge's note.

In his second post-conviction petition, Evans alleged that his counsel were ineffective for not pressing Judge Kahl to give a response more favorable to Evans. Judge Smith denied the claim on the merits, finding that Judge Kahl's answer "was an appropriate response by the Court, and counsel's failure to request more of the Court does not amount to incompetence." (Exh. 67 at 14).

In his habeas petition, Evans claims that: i) the court provided an inadequate response to the jury's questions by not providing evidence as to the likelihood of Evans's release on federal parole and ii) his trial counsel were ineffective in failing to request the judge to instruct on the likelihood of federal parole.

Evans's argument is based on *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). In *Simmons*, the Supreme Court held that "in assessing future dangerousness, the actual duration of the defendant's prison sentence is indisputably relevant," and found error in the trial court's refusal to instruct the jury on the likelihood of parole. *Id.* at 163–64, 114 S.Ct. 2187. Evans argues that Judge Kahl's failure to give a more specific answer as to his likelihood of parole violated his due process rights under *Simmons*.

Having reviewed the record, the Court finds no error in Judge Kahl's response to the jury and affirms Judge Smith's finding that: i) the answer given was appropriate and ii) Evans's counsel were not ineffective for failing to request a different, more favorable instruction. The trial court could not, at the time, have answered the question any more fully.

The first question in the note is unclear as to whether it refers to the potential state sentences for the Kennedy/Piechowicz murders or the sentences already imposed. Judge Kahl and counsel interpreted it to refer to the sentences already

imposed and properly directed the jury to the pre-sentence report.

Even if the jurors were asking about the potential life sentences for the state murder charges, no more specific answer could have been given. Under Maryland law, the sentencing jury decides whether a capital defendant is to receive the death penalty or, in the alternative, a life sentence. *See* MD.ANN.CODE, art. 27, § 413 (1996 repl. vol.). In Evans's case, he had been convicted of two murders. If the jury returned life sentences, then, also under Maryland law, the sentencing judge, rather than the jury, would decide whether they would be consecutive or concurrent after hearing argument from counsel and any further allocution from the defendant. *See Hunt v. State*, 321 Md. 387, 405, 583 A.2d 218 (1990). Accordingly, Judge Kahl could not have advised the jury as to the effect of life sentences for the Kennedy and Piechowicz murders. The only definite information available was contained in the pre-sentence report, to which the jurors were directed.

The second part of the question referred to how much time Evans would actually serve before being paroled. This issue is redundant to the ineffective assistance claim discussed *supra* at section III.A.3. As discussed previously, Evans's counsel made a strategic decision not to raise the issue of Evans's possible early release through federal parole, due to his upcoming eligibility for federal parole in 1993. Instead, counsel produced voluminous evidence as to the slim likelihood of Evans's being paroled on his state sentences before he became an old man. There was extensive testimony in the record as to the operation of the Maryland parole system. Such testimony would have been impossible to succinctly and accurately summarize in response to the question posed. Accordingly, the judge and counsel instructed

the jury that its recollection of this testimony would control.

The answer crafted by Judge Kahl and counsel was accurate and reasonable. Even if inaccurate, by merely referring the jury to the evidence already presented, the instruction could not have "by itself so infected the entire trial that the resulting conviction violate[d] due process." *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (citation omitted). Accordingly, Judge Smith's resolution of this issue must be upheld.

### 7. Ineffective assistance: no investigation/testimony on Evans's good behavior in prison

Evans next claims that resentencing counsel were ineffective in failing to call witnesses to provide evidence of Evans's good behavior while in prison. He does not identify any specific persons, but generally contends that, had resentencing counsel investigated, they would have located suitable individuals to testify on Evans's behalf.[57]

Evans raised this claim in his second post-conviction petition. Judge Smith reviewed the claim and made the following finding:

> A review of the transcript of the trial reveals that counsel presented extensive evidence in mitigation, which included evidence of Petitioner's institutional history. Defense counsel highlighted favorable aspects of his incarceration and focused on his time at the penitentiary at Marion. [Exh. 91 at 33]. Counsel is given great latitude to choose which witnesses are necessary to shed light on a particular point of mitigation, and failure to call witnesses from the federal penitentiary or to seek out experts in federal parole penal procedures is not incompetence.

---

57. For example, Evans claims that another inmate assaulted him at Marion, that he did not retaliate against his attacker, and that witnesses should have been called to present

this evidence. As noted by Judge Smith, Evans's counsel referenced the assault and Evans's refusal to retaliate in her closing argument. (*See* Exh. 91 at 33).

(Exh. 67 at 12). Having reviewed the record, this Court agrees that the issue of Evans's prison behavior was not overlooked by his counsel, but was sufficiently developed at resentencing. Judge Smith's conclusion is reasonable and therefore entitled to deference under § 2254.

### 8. Ineffective assistance: cross-examination of Charlene Sparrow

 Evans next claims that resentencing counsel provided ineffective assistance because they elicited a damaging response from Charlene Sparrow during cross-examination on her drug use. This questioning elicited from Sparrow testimony that Evans introduced her to heroin and that he regularly injected her with it. Evans contends that his counsel blundered into these allegedly damaging responses through questioning on cross-examination that was "needless" and "loosely structured," and therefore fell below "any objective standard of reasonableness." (Pet. at 57–58).

Sparrow had declined to speak with defense counsel prior to the resentencing. On cross-examination of Sparrow, Evans's counsel were establishing, as mitigating evidence, that both Evans's and Sparrow's behavior at the time of the killings was driven by drugs. As part of this theory, Evans's attorneys argued that his past criminal behavior was attributable largely to drugs, but that Evans was a changed man now that he had been drug-free for many years. The allegedly damaging statement arose from counsel's pursuance of this strategy.

The second post-conviction court denied Evans's claim on the merits, ruling that "it cannot be considered incompetent to be surprised by one answer from a witness counsel was unable to interview prior to trial." (Exh. 67 at 11). This Court agrees and finds that the second post-conviction court's application of *Strickland* to the

cross-examination of Sparrow was not contrary to or an unreasonable application of that precedent. Furthermore, given the defense strategy of mitigation, the testimony did not amount to prejudice under *Strickland.* The testimony is consistent with the defense's theory and demonstrates the extent of Evans's past degradation due to drugs and the concomitant rehabilitation while in prison.

### 9. Incorrect instruction regarding allocution/ineffective assistance

At resentencing, Judge Kahl gave an instruction on Evans's right not to testify. Immediately afterward, he instructed on Evans's right to allocute. The instructions were as follows:

Now, the Defendant has an absolute constitutional right not to testify. The fact that the Defendant did not testify in these proceedings must not be held against the Defendant. It must not be considered by you in any way or even discussed by you.

In a sentencing proceeding such as this, a Defendant has the right of allocution, which means he may address you and make a statement. During allocution, the Defendant is not under oath and thus not subject to the penalties of perjury or to cross-examination. The Defendant's allocution is evidence, and you should give it the weight and credibility you believe it deserves. You should not disregard his statements in allocution merely because they are not sworn testimony.

(Exh. 95 at 18).[58] At resentencing, Evans did not testify, but he did allocute shortly before the jury instructions were given. (*See id.* at 2–3 (electing not to testify) and 9–13 (Evans's allocution)).

 In his habeas petition, Evans does not object to the instructions individually. He does, however, criticize their juxtaposi-

---

**58.** The instruction preceding the two in question dealt with the testimony of expert witnesses, and the following one explained the

verdict forms that would be sent into the jury room. (*See id.* at 18–19).

tion. The allocution instruction, following so close to the Fifth Amendment instruction, implied that Evans was willing to speak only under circumstances in which he was not under oath, not subject to the penalties of perjury, and not subject to cross-examination. The allocution instruction was a "functional equivalent of adverse commentary on the accused's silence," Evans contends ... (Pet. at 60). Evans also claims that counsel were ineffective for failing to object to the juxtaposed instructions.[59]

Evans seeks support for this position in *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), which held that the prosecution may not use post-*Miranda* silence as a basis of impeachment. On state post-conviction review, Judge Smith, citing *Doyle,* found that the instructions were appropriate and "there was nothing to which counsel should have objected." (Exh. 67 at 14).

■ This Court agrees. Taken individually, the instructions were unobjectionable. The allocution instruction correctly stated that Evans's allocutory statement was evidence to be considered by the jury, but was not testimony. The Fifth Amendment instruction was also correct. As the Supreme Court decided in *Lakeside v. Oregon,* 435 U.S. 333, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978), a judge's instruction that the jury must draw no adverse inferences of any kind from a defendant's decision not to testify does not violate the Fifth Amendment. The instruction does not improperly "comment" on the defendant's invocation of his constitutional rights. The very purpose of the instruction, reasoned the Supreme Court, was "to remove from the jury's deliberations any influence of unspoken adverse inferences." *Lakeside,* 435 U.S. at 339, 98 S.Ct. 1091.

In juxtaposition, the instructions are also unobjectionable. A jury is supposed to consider each instruction in light of the other instruction. Juries are regularly admonished not to single out and unduly emphasize any particular instruction, but, rather, to consider the instructions as a whole. Thus, the order in which the instructions are given is of no constitutional importance.

Moreover, this Court believes that the juxtaposition improved the clarity of the two instructions, leaving the jurors with the clear understanding that: i) Evans did not testify, but we are not permitted to hold this against him or consider it in any way and ii) Evans did allocute; his allocution is not testimony, but it is evidence that we are bound to consider. Judge Kahl clearly advised the jury that they were not to disregard Evans's allocution simply because it was not sworn testimony; "[y]ou should not disregard [Evans's] statements in allocution merely because they are not sworn testimony." (Exh. 95 at 18).

Having concluded that Judge Smith's rejection of Evans's claim is reasonable, this Court is bound to uphold the state court adjudication on this issue.

**10. Redaction of pre-sentence report**

■ Evans's next claimed error relates to information contained in the pre-sentence report introduced into evidence during his resentencing. The pre-sentence report produced in 1992 for use in resentencing included a portion of the original 1984 report. In the older portion, the pre-sentence report stated that Evans did not wish to make a statement and declined to be interviewed by the investigator preparing the report.[60] Evans sought to have

---

**59.** Once more, the State contends that the underlying claim here is procedurally barred because Evans failed to raise the claim in the state proceedings, and Evans responds by claiming ineffective assistance. Because a bald allegation of ineffectiveness does not satisfy the requirements for "cause" to defeat

procedural default, the underlying claim is barred from review in this Court. Nevertheless, as this discussion makes clear, the Court would also find the underlying claim to be without merit.

**60.** The two statements were: "On June 15, 1984, Vernon Evans, Jr. informed this writer

this material redacted; the resentencing court denied his request.

Evans claims that this information was improperly included, made improper reference to Evans's refusal to testify against himself, and was prejudicial in violation of *Doyle v. Ohio, supra,* and *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). On appeal from resentencing, the Court of Appeals, after an extended discussion, determined that the inclusion, if error, was harmless. *Evans IV,* 333 Md. at 682–84, 637 A.2d 117. The second post-conviction court rejected the claim without further comment. (*See* Exh. 67 at 22).

This Court agrees with the Court of Appeals's finding that no prejudice occurred. The presentence report does not say that Evans had refused to testify, but that in 1984 he declined to make a posttrial statement to the court officer who prepared the report. At his second sentencing in 1992, however, Evans exercised his right to allocute, thereby removing any implication in the jurors' minds that he was unforthcoming about the incidents of April 23, 1983. As part of their strategy at resentencing, Evans's counsel argued that the years he had spent in federal prison had changed him for the better. The fact that he was unwilling to speak with an investigator in June 1984, six years prior to the resentencing, did not contradict that strategy.

Furthermore, the prosecution did not comment upon the statement, and the judge instructed the jury not to consider Evans's failure to testify. The concern expressed in *Doyle* and *Estelle* regarding impermissible comment upon the accused's right not to testify did not arise in this situation. The Court of Appeals, after an exhaustive consideration, stated that it was

that he did not wish to make any statement in regards to the present offense" and "It should be noted when this writer attempted to interview the subject at the Maryland Penitentiary on June 15, 1984, Mr. Evans declined to be interviewed." *Evans IV,* 333 Md. at 682 n. 5, 637 A.2d 117.

"satisfied beyond a reasonable doubt that if error was committed, it did not influence the jury's verdict." *Evans IV,* 333 Md. at 684, 637 A.2d 117.

This Court finds the Court of Appeals's determination to be correct and reasonable. The statement left in the pre-sentence report was, as the Court of Appeals stated, "but one item of evidence for the jury to consider"; to that extent, the error, if one was made, was nonprejudicial. *Id.* at 683, 637 A.2d 117.

## 11. Improper argument by prosecutor during closing

■ Evans's final claim of resentencing error relates to the prosecution's closing argument. The prosecution referred to a "lifer" who had recently escaped from a maximum security prison. The resentencing court had previously granted a motion in limine excluding prior statements by Evans on the possibility that he might escape from prison. As part of the ruling on the motion, the prosecution agreed not to "suggest that the Defendant may escape and, therefore, a life sentence may be insufficient to protect the community." (Exh. 83 at 32). When the prosecutor made the "lifer" reference, Evans's counsel immediately objected on the basis that: i) the comment violated the pretrial agreement and ii) it impermissibly referred to facts not in evidence. The objection was overruled by Judge Kahl.

Also during closing argument, the prosecutor made statements that implied that defense counsel had encouraged the jury to ignore its oath as jurors and that the defense lawyers were "lying" to the jury in their attempt to portray Evans as rehabilitated. The Court also overruled Evans's counsel's objections to these statements.[61]

61. On direct appeal, the Court of Appeals only addressed the "lifer" remark, and not the other objections which were also overruled by Judge Kahl. From the record, it appears that Evans did not pursue the other remarks made by the prosecutor on direct appeal, meaning he is procedurally barred

Evans contends that the trial court's allowance of these statements violated his right to due process. In overruling the objections, the court observed that the statements were "argument," and that the jury had been correctly instructed as to the relevance and weight of counsel's closing arguments. (*See* Exh. 95 at 128).

At resentencing, Evans's counsel put on evidence claiming that "lifers" adjust well to prison life and are often model prisoners. In trying to rebut this evidence, in closing argument the prosecutor made the following statement:

> And then when Mr. Cox asked him about the riot at the Penitentiary done by lifers and long-termers, he didn't check into that, or Mr. Dean, who escaped from the SuperMax, who was a lifer—[cut off by defense objection].

*Evans IV,* 333 Md. at 678, 637 A.2d 117. From the context, it is clear that the prosecutor was not retreating from his pretrial commitment, but was rather pointing out that all "lifers" are not model prisoners.

Evans raised, and the Court of Appeals denied, the "lifer" portion of this claim on appeal. *See id.* at 677–82, 637 A.2d 117. The Court of Appeals refused to hold that the remark was per se improper. That Court noted numerous newspaper articles referring to the recent recapture of the "lifer" who had escaped from "SuperMax," Maryland's highest security prison, and determined that the escape was permissibly the subject of comment in argument as a fact within the jury's common knowledge. *See id.* at 680–81, 637 A.2d 117. Furthermore, the Court of Appeals found

that, even if the remark was improper, no prejudice to Evans occurred.[62] The second post-conviction court, without elaboration, denied the claim on the merits. (*See* Exh. 67 at 21–22).

■ As the Court of Appeals noted, a prosecutor's argument may be the basis for reversible error only if the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). This Court finds the state courts' application of the law to the governing facts to be reasonable in light of *Darden.* Accordingly, this claim for relief shall be denied.

### D. Other claims

Finally, Evans raises several miscellaneous claims regarding jurisdiction and the death penalty.

### 1. Double jeopardy

■ Evans claims that his state prosecution constituted double jeopardy because the doctrine of "dual sovereignty" does not stretch so far as to permit Maryland to try Evans for murder after his federal conviction for related civil rights offenses. Evans notes that Assistant United States Attorney Irwin was specially deputized to participate in his state prosecution, and former Assistant State's Attorney Dana M. Levitz assisted with his federal trial.[63] Consequently, Evans argues, the state and

---

from raising them here. (*See* Exh. 56). In any event, the Court finds that the prosecutor's arguments did not "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." *See Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

**62.** The Court found:

> It is inconceivable that this single reference would alter the manner in which the jury approached its responsibilities. That a jury might have inferred that Evans would escape from prison because Dean escaped

from "SuperMax," and that this inference would be strong enough to convert a life imprisonment sentence into a death sentence, is pure speculation. Moreover, the trial court gave a curative instruction, twice cautioning the jury that opening statements and closing arguments of counsel are not evidence.

*Evans IV,* 333 Md. at 681–82, 637 A.2d 117.

**63.** Dana M. Levitz is now an Associate Judge of the Circuit Court for Baltimore County.

federal governments acted as one sovereign with respect to his prosecutions.

Evans raised the double jeopardy argument in an interlocutory appeal that was decided before the guilt phase trial. In a well reasoned, fourteen page opinion, the Maryland Court of Appeals rejected Evans's claim. *See Evans I*, 301 Md. 45, 481 A.2d 1135. The Court of Appeals recognized that double jeopardy does not occur when the offenses charged in separate prosecutions contain different or additional elements, as was the situation in Evans's case.[64] *See Brown v. Ohio*, 432 U.S. 161, 166, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977).

Evans also raised the double jeopardy claim in his second post-conviction petition. Judge Smith rejected Evans's argument that *Evans I* was incorrectly decided because the Court of Appeals had been unaware of the extent of the collaboration between the federal and state prosecutors. Judge Smith noted that even if he were to accept this contention, Evans had provided no evidence that the extensive collaboration would have changed the ruling in *Evans I*. Judge Smith held that the cross-designations and cooperation between the state and federal prosecutors did not alter the dual sovereignty analysis. (*See* Exh. 67 at 2–3).

In his instant petition, Evans points to no Supreme Court precedent suggesting that the cross-designation of state and federal prosecutors transforms the state and federal governments into a single sovereign for purposes of double jeopardy. He does, however, cite to *Bartkus v. Illinois*, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959). In *Bartkus*, the Supreme Court found that Bartkus's federal and state prosecutions, which were based on the same acts, did not violate double jeopardy.

The Court, however, suggested that the result would have been otherwise if the state "in bringing its prosecution was merely a tool of the federal authorities. . . ." *Id.* at 123, 79 S.Ct. 676.

Evans presents no evidence that either sovereign was a mere "tool" of the other in prosecuting him. To the contrary, each had an interest served by his prosecution. The federal government prosecuted Evans for tampering with witnesses in Grandison's upcoming narcotics trial while the State of Maryland prosecuted Evans for the underlying murders.

Evans also cites to *United States v. Belcher*, 762 F.Supp. 666, 670–671 (W.D.Va. 1991), which held that a federal prosecution was a "sham" because the same federal prosecutor had participated in an earlier state trial. In *Belcher*, however, the federal prosecution ensued only after the defendant's state case had been dismissed prior to trial. The court, therefore, believed that the federal prosecution was a "sham"—a mere effort to resurrect the failed state prosecution.

Both *Bartkus* and *Belcher* are inapposite to Evans's case; there is no evidence that Evans's state prosecution was a sham or that the state government was acting as a mere tool of the federal government. In his state and federal prosecutions, Evans was indicted for different crimes with different elements. For these reasons, the state courts' rejections of Evans's double jeopardy claim must be upheld.

### 2. Maryland relinquished authority

 After his conviction in federal court, Evans began serving his federal sentence. The federal government released Evans into Maryland custody so

**64.** The Court of Appeals explained that the state substantive charges of murder and use of a handgun in a crime of violence contained different elements than the federal charge of conspiracy to violate civil rights. *See Evans I,* 301 Md. at 50 n. 4, 481 A.2d 1135. Even assuming arguendo that the state and federal charges against Evans were identical, the Court of Appeals wrote that it still would have rejected Evans's claim. Notwithstanding the bar on double jeopardy, a state government and the federal government may each prosecute a defendant for the same offenses. *See e.g. United States v. Wheeler,* 435 U.S. 313, 317, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978).

that he could stand trial on the state charges. Following conviction and sentencing in state court, Evans began serving his state sentence. The State then returned Evans to federal custody to serve the remainder of his federal sentence. Evans claims that by relinquishing him to federal custody, Maryland lost the power to compel him to complete his state sentence.

Evans raised this claim in both post-conviction petitions, and both courts denied the claim on the merits. The courts explained that Evans offered no authority in support of the "lost jurisdiction" claim. (*See* Exhs. 48 at 32; 67 at 3).

The Fourth Circuit has decided this very issue, concluding that Evans's transfer to Maryland in 1984 for trial was merely a "loan." Thus, Maryland did not "relinquish" Evans to federal custody, but merely returned him after the loan period had expired. *See United States v. Grandison*, 780 F.2d 425, 434 (4th Cir.1985), *vacated in part on other grounds*, 479 U.S. 1075, 107 S.Ct. 1269, 94 L.Ed.2d 130 (1987), *conviction aff'd. on remand*, 885 F.2d 143 (4th Cir.1989), *cert. denied*, 495 U.S. 934, 110 S.Ct. 2178, 109 L.Ed.2d 507 (1990). Given this explicit Fourth Circuit precedent, the decisions of the state post-conviction courts were clearly reasonable.

### 3. Death penalty is unconstitutional

Lastly, Evans claims that the death penalty is unconstitutional because it constitutes excessive punishment and is disproportionately imposed on males and on African–Americans in cases involving white victims.[65] The second post-conviction court denied this claim on the merits, noting that the Supreme Court had previously decided this issue in *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95

L.Ed.2d 262 (1987). (*See* Exh. 67 at 23–25).

The Supreme Court upheld the constitutionality of the death penalty in *McCleskey*, but only after considering extensive research, briefs, and arguments on the issue of racial disparity in the imposition of the death penalty. In following this clear Supreme Court precedent, Judge Smith acted reasonably and properly. His decision will not be disturbed.

## V. Conclusion

For the foregoing reasons, this Court finds Evans's petition for relief to be without merit and shall, by separate Order, DENY Evans's petition for relief.

---

**65.** Evans makes this argument in a cursory fashion, devoting no more than one page to this issue. He offers no support for his contention that the death penalty is disproportionately imposed upon males. The State contends that because Evans presented no evidence supporting this issue in his state proceedings, the claim should be barred. Regardless, this Court finds Evans's claim to be without merit.